**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JAARON M. STURGILL, II,                                      Case No. 1:19-cv-594

    Plaintiff,

                                              Hopkins, J.

    vs                                                    Bowman, M.J.

RODNEY MUTRESPAW, et al.,

    Defendants.

**REPORT AND RECOMMENDATION**

The above-captioned civil rights case was recently referred to the undersigned magistrate judge for consideration of two motions for summary judgment. In this Report and Recommendation ("R&R"), the undersigned recommends that Defendants' motions for summary judgment be GRANTED in part and DENIED in part.

**I.    Background**

Plaintiff, Jaaron M. Sturgill, II ("Sturgill"), was born in Hamilton, Ohio in 1996. By any measure, his childhood was difficult. But the portion of the story told by this case begins when Plaintiff was 20 years old, by which time he had been addicted to heroin for about three years.

On Tuesday, July 25, 2017, Sturgill was arrested in Middletown, Ohio and taken to the City Jail. Within 63 hours of his arrival at the Jail, he was unresponsive and transported to a nearby hospital. He survived but was eventually diagnosed with a number of serious conditions, including endocarditis, followed by an extended period of hospitalization and rehabilitation. He requires ongoing treatment and care.

Through counsel, Plaintiff filed suit against the Chief of the Middletown Division of Police, nine identified correctional officers[1] and the Jail nurse, alleging that all Defendants exhibited deliberate indifference to his serious medical needs during his detention, and seeking redress for his "permanent and significant neurological injuries and extreme pain and suffering." (Doc. 1 at ¶1). The Jail nurse, Dumouchelle, filed an individual motion for summary judgment. (Doc. 59). All remaining Defendants, Rodney Muterspaw, Christopher Smith, Officer Vance, Officer Brewer, Officer Lambert, Officer Lakes, Officer Downing, Officer Gibson, Officer Mann and Officer Marksbury (the "Middletown Defendants") filed a separate joint motion.[2] (Doc. 60).

In his response to the motion of the Middletown Defendants, Plaintiff concedes that "there is not sufficient evidence to proceed" on claims against Defendants Smith, Brewer, Lambert, Lakes, Downing, Mann and Marksbury. (Doc. 61, PageID 972). Plaintiff also does not contest summary judgment on his Third Cause of Action against Defendant Gibson. Finally, Plaintiff concedes that Defendant Muterspaw is entitled to summary judgment in his individual capacity. Accordingly, this R&R focuses on the remaining contested claims: Plaintiff's Second Cause of Action against Defendant Gibson and Vance in their individual capacities, Plaintiff's Fourth Cause of Action against Nurse Dumouchelle in her individual capacity, and Plaintiff's Fifth Cause of Action against Defendant Muterspaw in his official capacity.

---

[1] Plaintiff originally named five "John Doe" officers, but appears to have abandoned such claims as no other Defendants were identified.
[2] Both motions for summary judgment were originally filed on June 1, 2021. The undersigned sincerely regrets the circumstances that led to delay in resolution of those motions.

## II.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on the pleadings, but must present significant probative evidence in support of his case to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49. The mere scintilla of evidence to support the nonmoving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the nonmoving party. *Id.* at 252.

Rule 56(c) sets forth the procedures for supporting factual positions. Pursuant to Rule 56(c)(1), a party must support his assertion that a fact cannot be or is genuinely disputed by:

> (A)    citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B)    showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*Id.* Evidence submitted in support of summary judgment need not only consist of admissible evidence, so long as the evidence could be presented in a form that would be admissible at trial. When a party has failed to properly support or address a fact as required, the court may provide an additional opportunity to support or address the fact, or may consider the fact to be undisputed. *See* Rule 56(e).

### III.    Findings of Fact[3]

On Tuesday, July 25, 2017, Plaintiff and a friend went to an abandoned house in Middletown, Ohio in order to shoot up heroin. While there, Plaintiff told his friend that he had used some methamphetamine "the other day" and "thought maybe it could have been bad." At approximately 3:49 p.m., Plaintiff called 911 from his cell phone to obtain help for his friend, who had overdosed.

Middletown Police were dispatched to the house, where they intercepted Plaintiff. After determining his identity and discovering an outstanding warrant, they arrested him for burglary and for obstructing official business and transported him to the Middletown Jail. Plaintiff testified that he told the arresting officer that "my left arm went numb the night before," and that he wasn't "feeling good." (Doc. 48, PageID 269, 271).

At 4:50 p.m., Plaintiff was booked into the Jail by Officer Christopher Smith ("Officer Smith"). Officer Smith noted on an intake questionnaire that Plaintiff was conscious and understood what was going on but was under the influence of drugs. Plaintiff admitted to drug use and reported a penicillin allergy. Officer Smith left blank a

---

[3]The Findings of Fact reflect a compilation of facts agreed upon by the parties. Record citations are included for issues that remain in dispute.

section of the form asking for his visual opinions regarding whether Sturgill had any symptoms requiring emergency services or was experiencing alcohol/drug withdrawal symptoms. (Doc. 45, PageID 196-197, 225).

Sturgill's memory of the time period between being booked into the Jail and waking up in the hospital months later is mostly nonexistent, but occasionally strays into the realm of speculation. (Doc. 48, PageID 273, 285). For example, he recalls having his fingerprints taken and – at some undefined point in time -

> telling … the lady - - I don't remember - - was it a lady – in there, telling her that I was sick and I needed to get help and – I don't know. I don't remember – I don't remember but I do know what I *probably* said.

(Doc. 48, PageID 272-273, emphasis added).

Based on Plaintiff's penicillin allergy, Officer Smith placed a copy of Plaintiff's intake sheet in a box for a nurse to review. Plaintiff was then taken to Cell No. B12, where his friend, Aaron Smith, awaited him. Smith took the bottom bunk and Plaintiff moved his top bunk mattress to the floor, a common practice.

Since 2005, Tara Dumouchelle has worked for the Kaiser Medical Corporation ("Kaiser") to provide 10-15 hours per week of nursing services at the Jail. She sees inmates if an inmate submits a written sick call request, or if a verbal request is made by a corrections officer. In addition to her part-time job at the Jail, Dumouchelle has a full-time job at the Soin Medical Center in Beavercreek, Ohio.

The first issue of disputed fact concerns whether Nurse Dumouchelle initially examined Plaintiff on Tuesday evening. Officer Smith testified he put Sturgill's health questionnaire in the nurse's box for review. On July 25, 2017, Nurse Dumouchelle was in the Middletown Jail from 6:14 p.m. until 8:49 p.m. Dumouchelle points to documentary

5

evidence that she examined Plaintiff – the intake form bears her handwritten notations that Plaintiff was oriented x 4, and denied "any issues," with no history of medications or surgeries and no physician. (Doc. 45, PageID 224). However, she had no independent recollection of examining Plaintiff, (*see* Doc. 45, PageID 196-197), and Plaintiff's cellmate Smith denied that any medical personnel examined Sturgill at any time that they shared a cell. (Doc. 49, PageID 404; *see also* Affidavit, Doc. 49, PageID 491).

The next day was a "court day." At approximately 6:45 a.m. on Wednesday, July 26, 2017, Defendant Officer Gibson performed a cell-check, waking inmates with scheduled court appearances and instructing them to use the bathroom before court. Gibson reported that Plaintiff "did not want to get up and go." At the time, Smith told him that Sturgill "had some bad drugs," which Gibson understood to mean that Plaintiff was not feeling well. Sturgill also told him he did not want to go because he didn't feel good. (Doc. 50, PageID 529). Gibson responded by telling Plaintiff it would be in his best interests to get up and go, and called Brewer for assistance.

After arising,[4] Plaintiff was shackled in the hallway outside of his cell. Around 8:30 a.m., Plaintiff walked unassisted with other inmates to the elevator that goes up to the Middletown Municipal Court. Upon his arrival at Municipal Court, he was placed by a court liaison in a holding area so that he could meet with his lawyer, Kathleen Batliner, prior to his bond hearing.

While meeting with Batliner, Plaintiff told her that there was something wrong with his hand and that he had used "bad meth[.]" He also reported "extreme pain" in his legs, wrists and shoulders. (Doc. 54, PageID 627). Batliner observed that Sturgill could "hardly

---

[4]Gibson could not recall if he helped Plaintiff get up or not, but testified he was able to stand on his own once up. (Doc. 50, PageID 532).

stand up," had to be assisted in and out of his chair by the court liaison officer, had spots on his hands, and "could barely move." (*Id.*) Based on Plaintiff's complaints and her belief that Plaintiff had an "obvious" need for medical attention, Batliner requested that Plaintiff be released on an OR bond so that he could go to the ER for treatment. Batliner informed the judge that Plaintiff was in severe pain. However, after confirming with Plaintiff that he had already submitted a medical request at the Jail,[5] Judge Kemmer denied bond.[6]

After returning from court Wednesday morning, Plaintiff was asked if he wanted to stay cellmates with Smith and responded affirmatively. Before lunch,[7] the two inmates were moved from Cell No. B12 to Cell No. C17. At that time, Plaintiff picked up his belongings and walked to the new cell without incident.

Plaintiff told Smith that he had made a request for medical help while at Court. After lunch, Smith noticed Plaintiff had not eaten and was having trouble speaking. That same afternoon, Smith observed Plaintiff was not "making much sense" and had to help Plaintiff stand up to use the bathroom. In response to his observations including his cellmate's apparent inability to ask for help, Smith made multiple oral requests,[8] including to Defendant Gibson, that Plaintiff be seen by the nurse. In his requests, Smith reported that Plaintiff was not speaking right, did not "look so well[,]" and required assistance to

---

[5]Plaintiff's complaint alleges that he submitted a written Medical Complaint Form requesting medical assistance on the night he was booked. But Plaintiff testified that he did not recall submitting a written form, and Smith testified that he believed Plaintiff to have been incapable of writing such a request at the time.

[6]The basis for the denial is not in the record, but Ohio law would have prohibited granting the request in light of the existence of a holder from the outstanding warrant

[7]The complaint alleges that Plaintiff was transferred at 9:52 pm, consistent with a Jail computer log. (Doc., 1, ¶ 34). But Gibson testified that the time of the move entered into the computer was inaccurate and that the two inmates were actually moved during his shift before noon. (Doc. 50, PageID 544-545). Gibson explained that cell moves are logged "when you get an opportunity," (Doc. 50, PageID 542), and that the delay in entry might have occurred because he forgot to log the move.

[8]Defendants admit to Smith making one request. But on summary judgment, the undersigned construes the dispute concerning the number of verbal requests in Plaintiff's favor.

stand up to pee. (Doc. 49, PageID 402, 461-462, 479-480). But Smith did not report that Plaintiff was in pain and could not recall to whom he made the requests other than Gibson. In any event, Plaintiff did not receive any medical attention on Wednesday. The two remained in Cell No. C17 through the next morning, Thursday, July 27, 2017.

At approximately 7:34 a.m. on Thursday July 27, Nurse Dumouchelle entered the Jail. In a second disputed issue of fact, Dumouchelle testified that she again examined Plaintiff at Gibson's request that Plaintiff be seen. She recorded the following observations on a blank "sick-call form":

> Inmate seen due to complaining to COs about not eating or drinking. Seen inmate. Alert and oriented x four. Neuro intact walking without difficulty. States he does not want to talk to nurse. States he is fine. No diarrhea, vomiting noted. Inmate seen eating tray. Skin warm, pink, dry. Inmate asked multiple times to talk to nurse and inmate refused.

(*See* Doc. 56, PageID 830, with medical abbreviations spelled out for the Court's convenience). The form is erroneously dated Wednesday, July 26 - a fact that she attributes to clerical error.[9] At approximately 9:50 a.m., Dumouchelle left the Jail.

Sturgill disputes Dumouchelle's testimony in nearly every respect. Plaintiff points out that Gibson had no recollection of asking a nurse to see Plaintiff or of accompanying Dumouchelle to Plaintiff's cell. (Compare Doc. 50, PageID 552-553 with Doc. 45, PageID 179). And in a more direct contradiction, Smith testified that no medical staff came to evaluate Plaintiff on Thursday morning or at any other time that the two shared a cell.

---

[9]In addition to records that show that Dumouchelle worked on July 27, Dumouchelle points to a Booking Maintenance record dated July 28 after Plaintiff was transported to the hospital. In that record, the officer states: "Called Nurse Tara on subject due to subject not eating or drinking and urinating on himself, she stated yesterday when she was in subject would not talk to her when she tried to ask him medical questions." (Doc. 50, PageID 570-571).

Around 1 p.m. on Thursday afternoon, Smith reported to Officer Linda Vance that Plaintiff was sick and had not eaten his lunch. (Doc. 56, PageID 812). Vance asked Plaintiff directly "if he was OK" to which Plaintiff "said something like sick." (Doc. 56, PageID 814). Because it was jail policy for female officers not to enter a cell alone, Vance alerted Gibson that Plaintiff was "having problems." (Doc. 50, PageID 549). When Gibson arrived, he observed Plaintiff lying on the floor covered up. (Doc. 50, PageID 550; *see also* Doc. 56, PageID 815). Gibson told Plaintiff to get up. Smith observed Gibson pick Plaintiff up, "and they thought he was going to stand and he didn't, so he just immediately fell to the ground." (Doc. 49, PageID 403; *see also* Smith Affidavit at ¶ 4, PageID 491).

Neither officer informed medical personnel. Instead, around 1:13 p.m., Gibson and Vance walked Plaintiff from Cell No. C17 to Cell No. H3, an observation cell close to the central office that made it easier for officers to see if an inmate went to the restroom and ate. (Doc. 56, PageID 785). Vance recorded on a Booking Maintenance log that Plaintiff was moved to the observation cell "for not eating and not acting right/Subject would not get up and walk." (Doc. 50, PageID 570; *see* Doc. 56, PageID 811-817; Doc. 55, PageID 748; Doc. 60, PageID 950). Although there is video surveillance of the observation cells, neither party presented any video or other evidence of any actual observations of Plaintiff in Cell H3. In fact, Gibson testified that there was no protocol to check on inmates placed in observation cells other than "[e]very hour you still check on [them] normally, unless you see abnormal activity of some sort." (Doc. 50 at 559). Gibson's shift ended at 2:45 pm. Plaintiff was without medical attention through Friday morning.

At approximately 6:30 a.m. on Friday, July 28, 2017, Gibson and Vance began their shift with a cell check. Due to the smell emanating from Cell H3, Vance and Gibson

entered Plaintiff's cell. They discovered that Plaintiff was lying down, had urinated and/or defecated on himself and, while breathing and appearing to be conscious, was unresponsive.[10] (Doc. 50, PageID 554; Doc. 56, PageID 790). He appeared unable to converse but made a noise like a moan. (Doc. 56, PageID 804-805). At approximately 6:31 a.m., Vance attempted to call Nurse Dana Wilmot but was unable to reach her because her voicemail box was full. (Doc. 56, PageID 831). At 6:37 a.m., Vance called Dumouchelle and informed her of Plaintiff's status.[11] Dumouchelle stated that Nurse Wilmot would arrive shortly and told Vance to call Dr. Kaiser because Plaintiff had refused to speak with her the day before. (Doc. 45, PageID 207; Doc. 56, PageID 831). At 6:38 am, Vance sent a text message to Nurse Wilmot. For the next 18 minutes, Vance and Gibson proceeded with their normal routine. (Doc 56, PageID 831).

At approximately 6:56 a.m., Vance called Dr. George Kaiser and advised him of Plaintiff's status, which Vance deemed to be unchanged since her check at 6:31 am. (Doc. 56, PageID 802). Dr. Kaiser instructed Vance to call for a squad to transport Plaintiff to the ER. Vance did so and Gibson waited outside of Plaintiff's cell for their arrival.

Emergency Medical Technicians ("EMTs") arrived at approximately 7:05 a.m. After sharing Plaintiff's intake information, Vance held Plaintiff upright so EMTs could administer Narcan based on their belief that Plaintiff might have overdosed on heroin. (Doc. 56, PageID 807). At approximately 7:15 a.m., Plaintiff was transported to Atrium Hospital in Middletown. He was eventually diagnosed with sepsis and endocarditis,

---

[10] Vance testified that while she could not recall exact details, she probably talked to him and shook him in attempt to get a response. (Doc. 56, PageID 791).
[11]Dumouchelle did not recall being told and/or denied being told that he had urinated on himself. (Doc. 45, PageID 207-208). In contrast, Vance testified that he described the condition Plaintiff was in (Doc. 56, PageID 795), and Gibson documented that officers "Called Nurse Tara on subject due to subject not eating or drinking and urinating on himself." (Doc. 50, PageID 570).

among other conditions, and suffered multiple strokes. Plaintiff believes that his underlying infection was caused by his prior use of dirty needles. He underwent an upper right craniotomy and suffered neurological damage. After months of rehabilitation, he requires a cane to walk, has trouble with his memory, and needs assistance in many activities of daily living. He alleges he has incurred medical expenses in excess of $795,000.00, and continues to have ongoing expenses.

On August 9, 2017, Defendant Gibson was asked to make an entry into the Booking Maintenance Log. (Doc. 50, PageID 560-562). A supervisor stated she had spoken to one of Plaintiff's parents and "just wanted to keep our memory fresh…." (*Id*., PageID 562).  Gibson's entry states:

> This subject went up to court on his own. He was stating he can[']t walk but had no tr[o]uble walking to court and using the bathroom. I[']m putting this as a reminder. CO Brewer was with me when he went up to court.

(Doc. 50, PageID 571-572). On October 25, 2017, Gibson sent an email that reiterated the same information. (Doc. 50, PageID 562-563, 573).

### IV.   Analysis of the Pending Motions

#### A.  Evolving Legal Standards for Medical Treatment Claims

Before addressing Defendants' motions, the undersigned acknowledges recent developments in controlling case law.[12] A prison official's deliberate indifference to a prisoner's serious medical need clearly violates the Eighth Amendment, which prohibits cruel and unusual punishment. But as a pretrial detainee, Plaintiff's claim falls under the Due Process Clause of the Fourteenth Amendment. Until recently, that was a distinction without a difference because the Sixth Circuit analyzed both types of claims under the

---

[12]The parties' motions were fully briefed prior to the publication of *Brawner.*

same two-part test, requiring a plaintiff to show both an objective component (a medical need that was "sufficiently serious") and a subjective component (that the official knew of and disregarded an excessive risk to inmate health or safety). *See Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 591 (6th Cir. 2021), *cert denied*, 141 S. Ct. 213 (2022) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 and 837, 114 S.Ct. 1970 (1994)).

The Sixth Circuit has not modified the analysis of the objective component. But in *Brawner*, the Sixth Circuit joined the Second, Seventh and Ninth Circuits in holding that *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S.Ct. 2466 (2015), requires modification of the "subjective" component of a deliberate indifference claim brought by a pretrial detainee.[13] *Brawner*, 14 F.4th at 596. *Brawner* reasoned that instead of the higher standard akin to "criminal recklessness" adopted in *Farmer* for Eighth Amendment claims, a lower "civil recklessness" standard should apply for Fourteenth Amendment claims.

> What then is required to establish deliberate indifference in this context? Mere negligence is insufficient. A defendant must have not only acted deliberately (not accidentally), but also recklessly "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Farmer*, 511 U.S. at 836, 114 S.Ct. 1970 (describing, and rejecting as inapplicable to Eighth Amendment deliberate-indifference claims, the civil standard for recklessness). A pretrial detainee must prove "more than negligence but less than subjective intent- something akin to reckless disregard." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc); *see Darnell*, 849 F.3d at 35 ("[T]he pretrial detainee must prove that the defendant-official acted [or failed to act] intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."); *Griffith*, 975 F.3d at 589 (Clay, J., concurring in part and dissenting in part) (explaining that a pretrial detainee must prove that the defendant acted "intentionally to ignore [her] serious medical need or recklessly failed to act with reasonable care to mitigate the risk that the serious medical need posed to the pretrial detainee, even though a reasonable official in the defendant's position

_____
[13]*Brawner* rejected the position of the Fifth, Eighth, Tenth, and Eleventh Circuits. Given the frequency with which this issue arises, it is likely that the Supreme Court ultimately will resolve the circuit split.

would have known, or should have known, that the serious medical need posed an excessive risk to the pretrial detainee's health or safety").

*Id*., 14 F.4th at 596-97.

Since the publication of *Brawner* in September 2021, the Sixth Circuit has continued to clarify its import. *See, e.g., Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 316 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 692 (2024) ("Simply put, *Brawner* held that *Kingsley* required us to lower the subjective component from actual knowledge to recklessness."); *Howell v. NaphCare, Inc*., 67 F.4th 302, 311 (6th Cir. 2023) (observing that *Brawner* "changed the standard for pretrial detainees under the Fourteenth Amendment, adopting a civil-law recklessness standard that "calls a person reckless who acts or ... fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."); *Greene v. Crawford Cnty., Michigan*, 22 F.4th 593, 609 (6th Cir. 2022).

*Brawner* significantly alters the legal landscape when evaluating claims filed by pretrial detainees under the Fourteenth Amendment. The range of subjective culpability exists on a spectrum. At one end, a defendant might show that a plaintiff received such top-notch medical care that no reasonable jury could find the slightest negligence. In that case, a trial court would grant summary judgment to the defendant. At the other end of the spectrum, the evidence might show that a defendant cruelly and deliberately denied essential medical care for the sole purpose of causing pain and suffering. In such a case, a court would grant summary judgment to the plaintiff. In between those extremes lie negligence, the new Fourteenth Amendment civil recklessness standard and the traditional Eighth Amendment standard.

Historically, many defendants won summary judgment on failure-to-treat claims because the degree of subjective culpability was so high under the Eighth Amendment. There is a lot of daylight between mere negligence and Eighth Amendment culpability. To support an Eighth Amendment claim, a plaintiff must show

> that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." …The subjective requirement is designed "to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment."

*Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 446-47 (6th Cir. 2014) (quoting *Comstock v. McCrary,* 273 F.3d 693, 703 (6th Cir.2001)). But the evidentiary gap between negligence and civil recklessness is narrower. Thus, when the evidence presents legitimately close issues on whether a defendant has been merely negligent or has acted recklessly toward a pretrial detainee, a post-*Brawner* court is more likely to let a jury decide.

The sea change that *Brawner* wrought necessarily impacts the analysis of qualified immunity. Regarding Defendants' assertions of qualified immunity here, the underlying conduct occurred prior to *Brawner*. The Court must consider the clearly established law at that time, meaning the higher subjective standard that previously applied to both Eighth and Fourteenth Amendment claims. *See Lawler as next friend of Lawler v. Hardeman Cnty., Tennessee*, 93 F.4th 919 (6th Cir. 2024).

### B.  Plaintiff's Claims Against the Individual Defendants

Plaintiff's claims against Vance, Gibson and Dumouchelle assert that all three individual Defendants were deliberately indifferent to his serious medical needs. Specifically, Plaintiff alleges that Gibson and Vance ignored his need for medical care

until Friday morning, despite numerous requests and their observation of "obvious signs and symptoms" of his serious medical condition. (Doc. 1, ¶34). He alleges that both officers acted with deliberate indifference by failing to provide "access to qualified medical/nursing care without delay."  (*Id.*, ¶ 42). And he asserts that his injuries were proximately caused by the failure to provide care prior to Friday morning.[14]

In a separate claim against the Nurse Dumouchelle, Plaintiff alleges that she was "consciously and deliberately indifferent to [Plaintiff's] request that he receive medical treatment for his serious medical condition," and "[a]t no time" provided any nursing services to Sturgill. (*Id.*, ¶¶58-59). Plaintiff alleges that the sick call note dated July 26, 2017 was "fabricated" *after* Plaintiff had been transferred from the jail to the hospital "to make it falsely appear that [Plaintiff's] request for medical assistance had been responded to but that he refused any help." (*Id.*, ¶ 63). He asserts that Dumouchelle ignored his symptoms on Thursday or else fabricated the document "to memorialize a meeting with [Plaintiff] that never occurred." (*Id.*, ¶64; 65). He alleges that she either acted in wanton disregard of his right to be free from deliberate indifference to his serious medical needs, or alternatively, that she acted to conceal the other Defendants' unconstitutional conduct. (*Id.* at ¶ 66). Either way, he alleges that her deceit proximately caused his injuries.[15]

### 1.  Plaintiff's Objectively Serious Medical Condition

All  three Defendants first argue that Plaintiff did not have a serious medical need until Friday morning, when Vance and Gibson discovered Sturgill to be unresponsive. The

---

[14]The complaint does not appear to allege that Vance or Gibson were deliberately indifferent to his serious medical needs once they sought care on Friday morning.
[15]In their respective motions, none of the Defendants challenges causation.

undersigned disagrees. Defendants' argument incorrectly presupposes that only a condition requiring emergency care is sufficiently "serious."

No controlling case law requires an inmate or pretrial detainee to be on death's door before a medical need is deemed "serious" or "obvious." In *Burwell v. City of Lansing, Michigan*, 7 F.4th 456 (6th Cir. 2021), the Sixth Circuit explained the range of evidence that can prove the objective component of a claim.

> We require verifying medical evidence in cases involving 'minor maladies or non-obvious complaints of a serious need for medical care." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005) (quoting *Blackmore*, 390 F.3d at 898). (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005)). But in cases where the medical need is "'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,' the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated." *Blackmore*, 390 F.3d at 899-900 (quoting *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). "Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Id*. at 900. For instance, we held that the detainee in *Blackmore* had an "obvious need for medical care" that was "sufficiently serious" when he complained for two days about "severe" stomach pain and vomiting, which "a nurse identified [as] 'classic signs of appendicitis,'" and needed an appendectomy when he eventually received medical attention. *Id*. "Significant[ ]" to that conclusion was that the detainee vomited, which is "a clear manifestation of internal physical disorder." *Id*. at 899.

*Id*, 7 F.4th at 463.

"In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose." *Estelle v. Gamble*, 97 S.Ct. 285, 290, 429 U.S. 97, 103 (1976). But as stated in *Burwell*, minor maladies can constitute a "serious medical need" when supported by a diagnosis or medical documentation that proves that a delay in treatment resulted in injury. Even without such documentation, a mere toothache may still constitute a serious medical need well before it develops into an

abscess. To prove the objective element of his claim, a plaintiff need only show that his medical need was "serious" enough to require *some* medical treatment, meaning that the condition posed a substantial risk of serious harm if left untreated, and that the need was not addressed within a *reasonable* time frame.

When a plaintiff's medical condition is still evolving, the primary issue often concerns *when* the plaintiff needs treatment. Consider for example, a woman who may require no care in the first days of pregnancy, require *some* medical care as her pregnancy progresses, and require urgent care at the time she gives birth. Here, Plaintiff readily admits that his infectious disease was "evolving." (*See* Doc. 1, ¶2, admitting that Plaintiff "entered the jail with … an evolving, but as yet un-diagnosed, infectious condition."). The undersigned therefore reviews the evidence chronologically to ascertain when Sturgill had a serious medical need.

### a. The Lack of Obvious Symptoms on Tuesday Evening

No reasonable jury could find that Plaintiff exhibited an "obvious" need for medical attention at the time he entered the Jail on Tuesday, July 25. Plaintiff reported that he may have had some "bad meth" to his friend prior to his arrest, and reported feeling ill to the arresting officers. But there is no evidence (other than his own speculation that he "probably" requested help) that he presented with or reported symptoms to jail personnel. *Contrast Grote v. Kenton Cnty., Kentucky*, 85 F.4th 397, 406 (6th Cir. 2023). Consistent with Plaintiff's concession that there is insufficient evidence to proceed with a claim against Officer Smith, there is insufficient evidence of any serious medical need on Tuesday evening.

**b.  Mild Symptoms Early Wednesday Morning**

When Gibson first encountered Plaintiff early on July 26, Plaintiff remained prone on his mattress and "did not want to get up" to ready himself for court. Smith told Gibson that Sturgill "had some bad drugs," which Gibson understood as the reason for Plaintiff not feeling well. Sturgill also verbalized that he did not feel well. (Doc. 50, PageID 529). But Plaintiff eventually did get up and once shackled, around 8:30 am, was escorted to court without assistance. Plaintiff's brief interaction with Gibson would have alerted a reasonable observer to the presence of a *mild* level of physical illness, but not one so objectively *serious* that a lay person would have understood that he needed medical attention. Plaintiff concedes this point through the lens of the subjective component. (*See* Doc. 61 at 12, PageID 983, "[I]f Gibson's knowledge of [Plaintiff's] condition was limited to what he learned on the morning of July 26 (that Sturgill was not feeling well), it would be difficult to argue that Gibson knew of a serious medical condition and then disregarded it.").

**c.  Obvious Symptoms Emerge Wednesday Afternoon**

While at court, Plaintiff began to exhibit much more obvious symptoms. His reported pain level and symptoms led his attorney to seek an OR bond so that he could seek emergency care. But the urgency of Plaintiff's need for care remained unclear. Plaintiff was able to walk and responded affirmatively when the judge inquired whether he had already requested medical attention from the Jail.

Immediately after he returned to the Jail, Plaintiff appears to have walked unassisted with Smith to their new cell and did not report any medical concerns to staff. But over the next few hours on Wednesday, Smith noticed that Plaintiff had not eaten his

lunch[16] and was "not looking good," that "his speech was not all the way there" and that when he was "trying to talk …it just – no words were coming out," and that "he wasn't moving real quick." (Doc. 50, PageID 401, 479). At one point, Smith had to help Plaintiff stand up to urinate.

In response to Sturgill's physical distress, Smith made multiple verbal requests to corrections officers (including Gibson) for Plaintiff to be seen by the nurse.[17] (*Id*., PageID 461, testifying that he made at least four requests; *id*., PageID 476-479). Thus, a reasonable jury could conclude that Plaintiff had a serious medical need by Wednesday afternoon that required some level of medical attention.[18] Plaintiff remained unattended in Cell No. C17 through Thursday morning, July 27, 2017.

### d. Obvious Symptoms Progress on Thursday

To the extent that a reviewing court might disagree that Plaintiff had an objectively serious medical need by Wednesday afternoon, Plaintiff's medical condition continued to deteriorate and was obvious by Thursday afternoon, notwithstanding Dumouchelle's report that his symptoms briefly resolved at the time of her examination.

At 7:34 a.m. on Thursday morning, Dumouchelle logged in at the Jail. She testified that she examined Sturgill shortly after her arrival at Gibson's request. Her written report of her exam directly contradicts the existence of previously reported symptoms, and adds that Plaintiff himself told her that he was "fine" and refused to answer other medical questions. Dumouchelle's testimony and sick-call note are heavily disputed. But even if

---

[16]Lunch trays were passed out between 11 am and noon. (Doc. 50, PageID 526).
[17]Defendants admit to Smith making one verbal request. But the number of requests is a disputed issue that the Court construes in Plaintiff's favor on summary judgment.
[18]Defendants make much of the fact that Smith did not report that Plaintiff was in "severe pain." But there is no support for the contention that severe pain is required to prove the objective component of a Fourteenth Amendment claim.

Plaintiff was the picture of health on Thursday morning during her exam, his condition had deteriorated by Thursday afternoon.

Smith reported to Vance around 1 p.m. that Plaintiff was sick and had not eaten his lunch. And Sturgill verbally confirmed he was ill. Gibson and Vance both observed Plaintiff lying on the floor covered up. (Doc. 50, PageID 550). When Gibson attempted to assist Plaintiff to his feet, "he just immediately just fell to the ground." (Doc. 49, PageID 403). The officers decided to move him to an observation cell based on his apparent symptoms. (Doc. 60, PageID 950). The decision to transfer Plaintiff to an "observation cell" is itself evidence that Plaintiff had an objectively serious medical need by around 1 p.m. Thursday.[19] *Accord Helphenstine*, 60 F.4th at 318 (placing a pretrial detainee in an observation cell based on his medical condition "tends to show a sufficiently serious medical need."); *see also Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004) (same).

## 2. The Subjective Element of Plaintiff's Claim

Gibson, Vance and Dumouchelle next argue that no reasonable jury could find in favor of Plaintiff on the subjective element of his claim. Plaintiff must establish the subjective component of his claim for each of the named Defendants because subjective knowledge is not imputed from one defendant to another. For example in *Moore v. Frazier*, 2:21-cv-4134-SDM, 2024 WL 2804092, at *9 (S.D. Ohio May 31, 2024), the court granted summary judgment where plaintiff produced evidence about the actions of

---

[19]Defendants argue that Plaintiff is required to prove that Plaintiff's medical condition was obvious *to Vance and Gibson*. But the "obviousness" of a plaintiff's medical condition is judged on purely objective symptoms that – if observed – would be "obvious" to anyone. To hold that that the symptoms must have been observed and obvious to Defendants improperly conflates the subjective element with the objective. *Accord Grote*, 85 F.4th at 407.

unnamed officers who refused to call for medical attention despite his ongoing complaints but did not identify any named defendant who ignored his complaints. In contrast to those unidentified officers, the evidence showed that the named staff members promptly consulted both with superior officers and with medical staff to assess the plaintiff's medical needs.

### a. Gibson

Gibson argues that no reasonable jury could find him liable under the subjective element because he communicated Plaintiff's symptoms to Nurse Dumouchelle "at the first available opportunity." (Doc. 60 at 27, PageID 914). The undersigned disagrees.

Plaintiff and Smith both informed Gibson early Wednesday morning that Plaintiff did not want to go to court because he was sick. Gibson testified that "it's not uncommon for people to feel sick and not want to go to court that were drug users." (Doc. 50, PageID 529). While Gibson's failure to offer medical assistance for such a vague and minor complaint does not rise to the level of recklessness, the interaction did put Gibson on notice that Plaintiff was ill.

By Wednesday afternoon, Smith alerted Gibson that Plaintiff's physical condition had deteriorated and that Plaintiff was not eating, looked ill, was having difficulty speaking, and required assistance to stand up to urinate. Despite Smith's multiple requests that Sturgill be seen by a nurse, Gibson chose not to report Plaintiff's symptoms to any superior officers or to medical staff during his shift that day. Instead, Gibson waited until early Thursday morning to report Plaintiff's symptoms to Dumouchelle. Once he did so, it would have been reasonable for Gibson to defer to her clinical assessment that as

of Thursday morning, Plaintiff was able to speak, stand and walk without difficulty, refused medical help and confirmed he was "fine."

For the reasons discussed, the evidence is sufficient to present a triable issue on whether Dumouchelle actually examined Plaintiff on Thursday morning. Regardless, within five hours of the alleged exam, by 1 pm on Thursday afternoon, Gibson was presented with evidence (Smith's new report) that Plaintiff was not "fine" but was exhibiting significant physical symptoms.

> Our caselaw has recognized that generally "a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he 'reasonably deferred to [a] medical professionals' opinions.'" *Greene*, 22 F.4th at 608 (quoting *McGaw v. Sevier County*, 715 F. App'x 495, 498 (6th Cir. 2017)). Such deference, however, may not be absolute or indefinite, particularly when officers are tasked with monitoring a detainee. *See, e.g.*, *Stojcevski v. Macomb County*, 827 F. App'x 515, 522 (6th Cir. 2020) (summarizing the relevant law that an officer can rely on a medical opinion for a "reasonable period of time after it is issued, absent circumstances such as the onset of new and alarming symptoms").

*Howell v. NaphCare, Inc*., 67 F.4th at 315.

Smith's new report on Thursday added to Gibson's fund of knowledge concerning the progression of Plaintiff's illness. Gibson knew the prior reports and from his personal observations, including Plaintiff's fall to the ground when Gibson attempted to stand him up, that Plaintiff was obviously ill and in need of assistance. But rather than consulting with medical staff or notifying a superior officer, Gibson simply moved Plaintiff to an observation cell. A reasonable jury could find that Gibson's inaction (failing to contact medical personnel) was deliberate and "reckless" in the face of an unjustifiably high risk that Plaintiff's progressive symptoms would continue to worsen. *See Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 318 (6th Cir. 2023) (holding that officer who knew inmate was "dope sick" should have known that inmate was in need of medical attention,

and that jury could conclude that officer recklessly disregarded known risk based on the failure to seek immediate medical attention after moving him to detox cell); *contrast Moore v. Frazier*, 2024 WL 2804092, at *10 (finding insufficient evidence of subjective awareness for defendant officers who became aware of inmate's stomach pains but had no knowledge of prior illness, where officers notified their superiors and logged their observations every 15-30 minutes); *id.* at *11 (granting summary judgment to additional officers who contacted nurse for advice and reasonably complied with her instructions).

### b. Vance

Compared to Gibson, Vance had little knowledge of Plaintiff. She first encountered Sturgill when Smith alerted her Thursday afternoon that Plaintiff had not eaten and was sick.[20] She saw Sturgill lying on his mattress. When she asked if he was okay, "he said something like sick," but "didn't make that much, you know, conversation." (Doc. 56, PageID 814). She and Gibson jointly decided to move Plaintiff to an observation cell. Although she would have been in a position to observe Plaintiff fall when Gibson lifted him, Vance testified she did not know whether Plaintiff was *able* to stand on his own. On a Booking Maintenance log, she wrote that Plaintiff "*would* not get up and walk" implying that his failure to walk was voluntary. (Doc. 50, PageID 570, emphasis added).

The fact that Vance moved Plaintiff to an observation cell confirms her knowledge of Plaintiff's serious medical need. While her limited contact and belief that Plaintiff had fallen ill only within the last hour present a closer issue concerning her subjective intent, a reasonable jury still could find her decision not to offer Plaintiff medical assistance or to consult with medical staff to be "reckless" under the Fourteenth Amendment standard.

---

[20] Smith testified that he notified Vance just before leaving for recreation. Smith's version, to the extent it contradicts Vance's, has been credited for purposes of summary judgment.

*See Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 318 (6th Cir. 2023) (holding that officer who knew inmate was "dope sick" should have known that inmate was in need of medical attention, and that jury could conclude that officer recklessly disregarded known risk based on the failure to seek immediate medical attention after moving him to detox cell).

On Friday morning when Vance next encountered Sturgill, it was immediately clear that something was seriously wrong. When unable to reach the scheduled nurse by phone, she called Dumouchelle, who advised her that the other nurse would soon be in and to call the jail doctor. Vance texted the scheduled nurse and phoned the Jail doctor at 6:56 a.m. Plaintiff does not assert that the brief delay in reaching medical staff or calling for a squad was reckless.

### c. Nurse Dumouchelle

Although Defendant Dumouchelle was privately employed by Kaiser Medical Corporation,[21] her services at the Jail qualified her as a government official acting under color of state law for purposes of Plaintiff's § 1983 claim. *See Shadrick v. Hopkins Cty.*, 805 F.3d 724 (6th Cir. 2015). Dumouchelle insists she rendered appropriate and timely medical care with a screening examination upon Plaintiff's Jail admission and a "sick call" examination on Thursday morning. She cites to the July 25 intake questionnaire that bears her handwritten notations that he had "no issues" upon arrival to the Jail as corroborating her account. More critically given the evolution of Plaintiff's serious medical need, she points to the "sick call" note, allegedly created Thursday morning, as proof that Plaintiff was "fine" and refused medical attention.

---

[21]The Jail doctor, George Kaiser, D.O., is the sole shareholder of Kaiser Medical Corporation.

But Smith provided deposition testimony and an affidavit attesting that Dumouchelle did not examine Plaintiff at *any* time that he shared a cell with Sturgill, including Thursday morning. Dumouchelle urges this Court to reject Smith's sworn testimony because he admitted he was still experiencing the effects of his drug overdose on Tuesday evening. And she suggests that it was "possible" that Smith was at court or in the dayroom at the time she examined Plaintiff on Thursday morning.

The undersigned cannot resolve this disputed issue of material fact. Smith's testimony along with other discrepancies in the record[22] are sufficient to create a triable issue on whether Dumouchelle examined Sturgill on Thursday morning and/or created an accurate record of that exam. Smith swore to the accuracy of his account, and this court may not make credibility determinations on summary judgment. As for Dumouchelle's suggestion that Smith was absent from the shared cell at the time of her exam, the record reflects that there was no court on Thursdays, nor was there recreation in the dayroom at that time.

Dumouchelle also dismisses Plaintiff's allegation that she fabricated her exam note as "self-serving" and as "pure speculation." (Doc. 59 at PageID 878). But courts should not "disregard evidence merely because it serves the interests of the party introducing it." *Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th at 314 (quoting *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010)). If Dumouchelle ignored Gibson's request to examine Plaintiff on Thursday morning, or if she falsely recorded that he was asymptomatic and refused medical attention, then her conduct would satisfy the

---

[22]Dumouchelle's recorded observations that she observed Plaintiff eating from his meal tray while sitting on a bunk are inconsistent with his mattress being on the floor, as well as evidence that breakfast trays would have been retrieved hours before her exam. (*See* Doc. 60, PageID 963; Doc. 50, PageID 518).

subjective element of Plaintiff's claim. *See Jackson v. City of Cleveland*, 925 F.3d 793, 815-816 (6th Cir. 2019) (holding that fabricated evidence can prove a violation of the Fourteenth Amendment, citing *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006)); *see also Helphenstine*, 60 F.4th at 322 (finding inconsistencies created issue of fact as to whether a physician made phone calls concerning detainee's medical condition, and that reasonable jury could conclude that physician either knew that plaintiff required treatment but failed to direct jail staff to transport him to the hospital, or that the treatment provided by the physician was "so cursory as to amount to no treatment at all").

In her reply, Dumouchelle asserts that if she did not examine Plaintiff, she would have had no knowledge of Plaintiff's medical condition. But that ignores her admission that Gibson informed her that he needed to be examined. In addition, a reasonable jury could conclude that she examined Plaintiff and falsely recorded his symptoms.

### 3. Qualified Immunity

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine "'gives ample room for mistaken judgments by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 341 (1986)). "To overcome a defendant's assertion of qualified immunity, a plaintiff must show both (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time of the violation." *Downard for Estate of Downard v. Martin*, 968 F.3d 594, 599-600 (6th Cir. 2020) (citing *Pearson v. Callahan*, 555 U.S. 223, 231-32

(2009). *Brawner* changed "clearly established" Sixth Circuit law in September 2021. Because the relevant events took place in 2017, Defendants are entitled to rely on the previously established Eighth Amendment standard. Thus, to overcome qualified immunity, Plaintiff must show that each Defendant subjectively perceived that a failure to seek earlier medical attention created a significant risk to his health, and that they "'consciously' (not recklessly) disregarded that risk." *See Lawler*, 93 F.4th at 928 (quoting *Farmer*, 511 U.S. at 839).

### a. Vance and Brawner are Entitled to Qualified Immunity

Vance is entitled to qualified immunity. She first learned Plaintiff was ill around 1 p.m. on Thursday and believed that Plaintiff's illness was of very recent origin. At that time, Plaintiff was able to verbalize that he was "sick." She observed he "was not acting right" and "would not" get up and walk but did not know if he *could* walk. Her failure to seek an immediate medical consultation was imprudent and possibly even reckless under *Brawner* but did not reflect subjective culpability under Eighth Amendment standards. The record appears undisputed that she did not subjectively appreciate the risk to Plaintiff's health posed by not seeking medical advice during the roughly 1.5 hours that elapsed before she ended her shift on Thursday afternoon.

Gibson is also entitled to qualified immunity, although his conduct on Thursday afternoon presents a closer issue. Unlike Vance, Gibson was aware that Plaintiff had been feeling ill since Wednesday morning and had significant symptoms on Wednesday afternoon. But his delay in reporting Wednesday's symptoms to Dumouchelle on Thursday morning appears to have been based on a misguided subjective belief that Plaintiff was suffering from routine drug withdrawal symptoms for which urgent treatment

was not required. The fact he asked Dumouchelle to examine Plaintiff reflects some intent to attend to Plaintiff's serious medical needs. *See Britt v. Hamilton County*, 2021 WL 1184057 at *12 (6th Cir. March 30, 2021) (affirming summary judgment to supervising officer who subjectively believed that plaintiff was going through withdrawal which was being monitored and treated by nursing staff)[23]; *contrast Grote*, 85 F.4th at 409 (rejecting defendant's "routine withdrawal" defense of her subjective state of mind, "in light of our post-*Brawner* jurisprudence.").

After contacting Dumouchelle, Gibson was entitled to do nothing further for some period of time, particularly since Dumouchelle concluded that Plaintiff had no symptoms and was "fine."[24] *See McGaw v. Sevier County*, 715 F. App'x 495, 498 (6th Cir. 2017). But when Gibson received Smith's new report about Plaintiff's symptoms roughly five hours later, he was required to consider that new information. "At a certain point, bare minimum observation ceases to be constitutionally adequate." *Greene v. Crawford Cnty., Michigan*, 22 F.4th 593, 609 (6th Cir. 2022). In evaluating Gibson's subjective intent, the undersigned considers that when he moved Plaintiff to an observation cell, Gibson knew that Plaintiff had been ill since early Wednesday morning, that his symptoms had

[23]*Britt* involved claims by the estate of a pretrial detainee known to be an IV drug user who died after his endocarditis was misdiagnosed at a county jail. *See id.*, 531 F.Supp.3d 1309 (S.D. Ohio 2021). Unlike this case, all but one of the defendants in *Britt* were nurses who were heavily involved in the plaintiff's care. Nurses performed a complete medical screening on intake, recording vital signs including blood pressure, temperature and pulse and continued to frequently examine and monitor Britt's vital signs based on a mistaken belief that he was experiencing heroin withdrawal. They discontinued taking vital signs after a supervising officer placed him on suicide watch with medical consultation, but correctional staff still recorded observations every 10 minutes. When plaintiff's condition changed, they immediately summoned medical staff. The district court granted qualified immunity to all defendants under *Farmer*'s Eighth Amendment standard. In a split and unpublished decision, the Sixth Circuit affirmed, reasoning that the defendants were entitled to qualified immunity even after *Brawner*. *See Britt v. Hamilton Cnty*, 2022 WL 405847, at *5 (6th Cir. 2022).
[24]The record is silent on how (or whether) Dumouchelle communicated her report to Gibson. But even if she did not, Gibson was entitled to rely on Dumouchelle's presumed exam once he referred Plaintiff to medical.

increased both Wednesday afternoon and Thursday, and that he fell down when Gibson tried to help him to stand. Although Plaintiff was able to verbally confirm "something like sick," he was not conversational and the extent to which he could walk unassisted was unclear. Gibson clearly *should have* realized that Plaintiff's need for medical attention was increasing in urgency. *See Helphenstine*, 60 F.4th at 318-19 (holding that delaying treatment by sending an overnight fax that would not be reviewed by a physician for hours could be sufficient to prove deliberate indifference under *Brawner*).

Still, Gibson had no medical training. Even if his inaction could be found to have been "reckless" under *Brawner*, his failure to seek immediate medical assistance or at least to institute closer observation prior to ending his shift at 2:45 p.m. does not reflect "conscious" disregard of a significant risk under pre-*Brawner* standards. Gibson remains entitled to qualified immunity because under *Farmer*, the record is insufficient to show that he *consciously* appreciated the risk to Plaintiff's health by doing nothing more than moving Plaintiff to an observation cell on Thursday. And Plaintiff does not identify any specific fault with Gibson's conduct on Friday morning.

### b.  Dumouchelle is not Entitled to Qualified Immunity

Unlike Vance and Gibson, Dumouchelle is not entitled to qualified immunity. A reasonable jury could conclude that, as a medical professional, she knew that Plaintiff required medical attention by no later than Thursday morning, but deliberately disregarded that serious need either by failing to examine him at all, and/or by fabricating a record that falsely stated that he had no symptoms. Unlike the significant care and monitoring of vital signs provided by nurses in *Britt* for what they mistakenly believed to

be withdrawal symptoms, the record here evinces (at most) a cursory examination by Dumouchelle that a jury could conclude amounted to no care at all.

### C. Failure to Train Claim Against Muterspaw in his Official Capacity

The claim against Muterspaw in his official capacity as Chief of the Middletown Division of Police is equivalent to a claim against the City of Middletown itself. In order to impose liability, Plaintiff must show that a City policy or custom resulted in the alleged violation of his constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). "A municipality may be liable under § 1983 for failure to train when it amounts to deliberate indifference." *Howell*, 67 F.4th at 319 (citing *City of Canton v. Harris*, 489 U.S. 378, 388-89, 109 S.Ct. 1197 (1989)). Plaintiff alleges that Muterspaw (a/k/a the City) failed "to provide adequate training to the corrections officers working in the jail to ensure that jail detainees received adequate treatment for medical conditions from which the detainees were suffering." (Doc. 1, ¶ 59).

Plaintiff points to Middletown Jail Policy 9.8.2 as well as to testimony in support of his failure-to-train claim. The referenced Policy states that inmates are permitted "to report personal illness at any time of the day and emergency medical conditions whenever they occur," and that [t]he *staff will ensure they receive adequate treatment* for these medical conditions." (Doc. 51, PageID 609, emphasis added). The Policy does not explain how staff is to determine if an inmate has an actual illness or emergency medical condition, and the record supports Plaintiff's position that staff were expected to exercise considerable judgment in making those determinations.

Guidance for determining a "medical emergency" is provided in Subsection A. of the Jail's policy, which defines a medical emergency as including but "*not limited to*, the

following: profuse bleeding, severe pain, unconsciousness, severe head injury, chest pains, difficulty breathing, severe burns, or psychotic behavior which presents a danger to the inmate or others." (*Id.*, emphasis added). A related provision, Section G., pertains to "inmates manifesting symptoms of intoxication or detoxification from alcohol, opiates, hypnotics, or other drugs," and states that "[j]ail medical staff are contacted and have a role in the assessment, treatment, and observation" of such inmates. (*Id.*, PageID 611).

The Policy was approved by Dr. George Kaiser, who has been the "Jail Doctor" for 25 years, (Doc. 51, PageID 579). While he is available by phone "24/7 …if they're worried about anybody," (*id.*, PageID 585), he only spends about eight hours per month at the Jail. (*Id.*, PageID 582). In 2017, he was unaware of Sturgill before receiving a call from staff on Friday morning, at which point he told Vance to call a squad. (*Id.*, PageID 601).

Dr. Kaiser testified that although the Policy defines a medical emergency through a list of symptoms, inmate complaints require scrutiny and the exercise of judgment to determine if they are truly a "medical emergency," due in part to the "heavy population of people that are abusing drugs." (*See* Doc. 51, PageID 599-600). He provided the following examples:

> For instance, profuse bleeding -- some of these guys will pick a scab off and they'll say they have bad bleeding and they need to go to the emergency room.
>
> They all say -- if they have pain, it's all severe pain and they all want to go to the emergency room.  And some of them act unconscious but they're really not unconscious.
>
> So there's -- there are issues with each one of these words or series of words that really need to be expounded upon.
>
> And a lot of this is judgmental so I can't -- I can't really tell you, you know, they all have severe -- if they -- if they hit -- if they bump their head, they all have severe head injury. Chest pain, they all are having a heart attack, you

> know, and -- so it's kind of hard because then we have to use our judgment,
> you know.

(Doc. 51, PageID 594).

Dr. Kaiser agreed that the non-exhaustive list of symptoms listed in the Policy is intended to help staff use their judgment "to determine what's a legitimate complaint… and what's just speeches." (*Id*.) "[A] lot of people here …will fake things so they can get out of jail for awhile [sic]." (*Id*., PageID 599). In addition, inmates using drugs will experience pain based on withdrawal of a drug. "And so it's hard to separate what is - - what is true pain and what is pain because of - - of their lifestyle." (Doc. 51, PageID 600). Staff are not provided with any specific training on how to use their judgment to determine if an inmate's complaints constitute a "true" medical emergency. (Doc. 51, PageID 596; *see also* Doc. 50, PageID 507-508 (Gibson's testimony that the Jail provided no guidelines in particular and that he relied on his own common sense to determine whether an inmate appeared in distress).

If non-medical staff determines that a "medical emergency" exists, Subsection A.1. of the Jail Policy instructs on procedures to be followed

> A.1. If a medical emergency occurs in the jail, jail staff will immediately call for an emergency squad, and the on-duty Shift Commander, or in his absence, the senior Sergeant and the jail nurse will be notified at once. If the staff member receiving the complaint is unsure as to the seriousness of the complaint, the ranking supervisor will be contacted as well as the jail nurse. The jail nurse will make the decision as to the seriousness of the complaint. If the jail nurse does not respond within 15 minutes, the ranking supervisor will assess the situation and take appropriate action. Jail staff will administer first aid when appropriate.

(Doc. 51, PageID 610).

The Policy also includes provisions for the administration of more routine medical care, with "sick call" to be held "no less than three times per week." (Doc. 51, PageID

32

610). In addition, inmates' medical complaints are to be reviewed "daily by qualified medical personnel in conjunction with the facility physician and treatment provided as deemed appropriate." (*Id.*) To convey a medical complaint, "[i]nmates can speak or fill out a medical complaint form…and give it to the doctor or other health trained personnel." (*Id.*)

Gibson testified that many inmates had made complaints that they could not stand up, had difficulty walking and couldn't get to the toilet, which ostensibly would "fit [his] definition of distress" for a medical emergency. (Doc. 50, PageID 509). When asked if he would "report [such complaints] to your sergeant or shift commander or nurse," Gibson at first responded "[*d*]*epending on the circumstances*," noting that if the inmate was eating "and was clean looking, I assumed they might be lying to me." (*Id.*, emphasis added). He subsequently clarified that he would <u>always</u> provide any inmate with a medical complaint form to complete to request a nurse evaluation, without exception, even if he thought they were lying. (*Id.*, PageID 510). However, there is no evidence that he offered a medical form to Plaintiff at any time.

In support of summary judgment, Defendant Muterspaw first argues that its policy caused no injury because Plaintiff did not experience a medical emergency prior to Friday morning. Defendant specifically cites to the absence of evidence that anyone at the Jail was aware of Plaintiff's "severe pain" – a listed symptom of a medical emergency in the Policy.[25] But Plaintiff's claim does not rely on the knowledge of his severe pain. Plaintiff alleges that the Jail was required to train officers "to recognize situations where an inmate

---

[25]Plaintiff's complaint originally alleged that his "severe pain" was obvious when he was booked into jail, (Doc. 1, ¶ 18), and that he "submitted a written request for medical assistance the night of his request," (*id.* at ¶3). Neither allegation is supported by evidence at this stage.

is demonstrating obvious signs of being seriously ill and in need of medical assistance," but that Defendants did not receive "adequate training…needed to identify [Plaintiff's] obvious symptoms." (Doc. 1, ¶¶ 73, 76). Even shy of a medical emergency, Sturgill alleges that "corrections officers did not receive the adequate training they needed to see that [Plaintiff] received the medical care he needed," and that the City "knew that the defendant corrections officers had not been adequately trained." (*Id.*, ¶¶77-78). Plaintiff also alleges that the City knew "that the harm done … was a foreseeable result of [Muterspaw's] constitutionally insufficient training on policies and procedures." (*Id.*, ¶ 80).

The City's next argument frames Plaintiff's claim another way, suggesting that corrections officers cannot have been expected "to connect Plaintiff's lethargic behavior and lack of an appetite to endocarditis… instead of someone coming down from their high or going through the beginning stages of drug withdrawal." (Doc. 60, PageID 926, citing Gibson's testimony that it was "drug users" who often felt sick). But Plaintiff's claim is not about his specific diagnosis. Rather, Plaintiff argues that the City's failure to provide *any* training on how to assess the validity of an asserted medical complaint, along with the lack of training on when to notify or consult with medical staff to ensure "adequate" treatment, was constitutionally deficient. In other words, in the absence of additional training, Plaintiff objects to the breadth of discretion afforded to non-medical staff as the gatekeepers for pretrial detainees to obtain medical care.

Countering that argument, the City maintains that even though Plaintiff "may take issue with… corrections officers making assessments about whether an inmate's alleged issue is sufficiently serious to constitute a medical emergency, the testimony in the record is consistent that such assessments are necessary" due in part to the heavy population

of drug users. (Doc. 60, PageID 927). The City cites to *North v. Cuyahoga County*, No. 17-3964, 754 Fed. Appx.380 (6th Cir. Nov. 5, 2018), a case in which the Sixth Circuit held that a County policy that affords *some* discretion to correctional officers did not violate Eighth Amendment standards.

In addition to being unpublished, *North* is easily distinguished.[26] There, the plaintiff was a Jail Trustee whose position would be revoked if he developed medical issues. He reported a medical issue in March, but when staff took him to see a nurse, he said his symptoms had resolved and refused treatment in writing. After that, he actively concealed a swollen hand, and that symptoms did improve. When he again sought medical care on May 8, it was for new pain in his neck, shoulders and abdomen. North received prompt medical attention from a nurse practitioner who suspected a gallbladder infection. She ordered urinalysis and blood tests but failed to ensure the lab orders were promptly completed on May 9 as expected. North collapsed from endocarditis on May 13 and filed suit under the theory that the failure to provide timely bloodwork caused his injury.

In a claim against the County, North argued that the policy permitted the COs some discretion in deciding whether to report his complaints about the incomplete bloodwork to the medical unit. While the record of whether North had complained was mixed, there was general evidence that *some* COs failed to report some inmates' complaints, and that *sometimes* medical kites were lost. On the other hand, there was no dispute that COs "typically passed inmate medical requests along to the medical unit and did not attempt to assess the inmate's medical needs on their own." *North*, 754 Fed. Appx. at 393. In

---

[26]Because North was serving a sentence and was not a pretrial detainee, Eighth Amendment standards applied.

addition, inmates "were able to request medical care through the kite system and did not have to rely on COs to access care," *Id.*  North knew he could submit a medical kite about the bloodwork but declined to do so. The court reasoned: "In light of the alternate means of requesting medical care available to inmates, any custom of *minimal CO discretion* does not rise to the level of deliberate indifference to serious medical needs in violation of the Eighth Amendment." *North*, 754 Fed. Appx. at 391 (emphasis added). Neither the facts of *North* nor its reasoning suggest that a Jail Policy that relies more on broader CO discretion to screen medical complaints of pretrial detainees is constitutionally sufficient under the Fourteenth Amendment, no matter the amount of training (or lack thereof).

Two controlling cases provide better guidance. The undersigned first considers *Winkler v. Madison County*, 891 F.3d 877, in which the Sixth Circuit rejected a claim that the county's training (as here, limited to CPR and first aid) was inadequate. But in *Winkler* a nurse worked on-site 40 hours per week (from 8 am to 4 pm weekdays) and additional medical staff including a physician and a nurse were available for consultation 24 hours a day, 7 days per week. The record reflected that correctional staff had consulted with medical staff multiple times with regards to the plaintiff's stomach pain. In response, medical staff had repeatedly taken the plaintiff's vital signs, and a physician had prescribed medications, albeit based on an incorrect diagnosis of heroin withdrawal. Also unlike this case, the *Winkler* plaintiff conceded that the Jail's practice was for a physician "to provide detailed guidance to jail personnel about how to monitor individual inmates if the physician determined that monitoring for a medical condition was necessary" and failed to identify what other training the staff should have received. *Id,*, 893 F.3d at 903.

In contrast to the active involvement of medical staff in *Winkler* stands the nearly non-existent involvement of medical staff in *Helphenstine v. Lewis Cnty.,* Kentucky, another case in which no jail employee had medical training beyond first aid and CPR. *Id.*, 60 F.4th at 312. There, the pretrial detainee (Helphenstine) vomited and stated he was "dope-sick." In response, a deputy jailer moved him to a "detox" cell where jailers took turns checking on him and logging their observations but did not notify the physician with whom the Jail had contracted for medical services. By midnight the next day, Helphenstine's condition had worsened. In response, a jailer faxed a non-urgent medical request advising of Helphenstine's objectively severe symptoms to the doctor's office, knowing it was closed at that early hour. The physician saw the request mid-morning but did not go in to examine the plaintiff. Instead, he allegedly twice informed jailers by phone that Helphenstine needed to go to the hospital and was told that Helphenstine had refused.[27] The doctor further testified that he advised jailers to encourage liquids (without telling them to monitor intake) and prescribed antiemetics. Helphenstine later died, allegedly from withdrawal or dehydration caused by withdrawal. The Sixth Circuit reversed the trial court's grant of summary judgment to most of the individual defendants and to the county.

In its review of the estate's failure-to-train claim, the Sixth Circuit reaffirmed that such a claim can be supported by "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Id.*, 60 F.4th at 323 (quoting *Shadrick v. Hopkins Cnty.*, 805 F.3d at 738-39 (internal quotation marks

---

[27]There was no record of the physician's calls or of Helphenstine's refusal to go to the hospital.

omitted)); *see also Howell*, 67 F.4th at 319;  *but see Moore v. Frazier*, 2024 WL 2804092 at *13 (granting judgment to county based on plaintiff's failure to allege and prove clear and persistent pattern of providing inadequate medical care to inmates in the past, holding that plaintiff could not rely on a single instance of inadequate care).

> Such a claim has three elements. Plaintiff must show (1) that the [local government]'s "training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler*, 893 F.3d at 902 (citation omitted).

*Id.*

In concluding that Helphenstine's estate had come forward with sufficient proof to present to a jury, the court contrasted the prevalence of drug and alcohol withdrawal with the absence of guidelines on how staff should care for an inmate experiencing withdrawal beyond contacting the facility physician. *Id*. at 324. In addition, the record was "mixed on whether the jailers ever received any training or instruction regarding withdrawal or medical emergencies." *Id*. The court concluded that the fact that some jailers could identify a medical emergency based on experience or common sense was not sufficient, in part because jailers had not identified Helphenstine's emergency in time to save his life. *Id*.

The *Helphenstine* court found evidence of substantial decision-making by untrained staff members to be sufficient to withstand summary judgment, emphasizing the lack of available medical staff at the jail.

> [T]he district court held that the fact that the jailers received only CPR and first aid training cannot create a question of fact on a failure-to-train claim in this circuit. That statement of the law is inaccurate. True, we have held that jailers trained in CPR and first aid received adequate training to respond to medical emergencies. *See Winkler*, 893 F.3d at 903; *Berry v. Delaware Cnty. Sheriff's Off.*, 796 F. App'x 857, 864 (6th Cir. 2019). But in *Winkler*,

the jail had trained medical staff on site forty hours per week, and medical staff was "available to jail personnel, either in person or by phone, for consultation about an inmate 24 hours a day, 7 days a week." 893 F.3d at 885, 903. And in *Berry*, the jail had "nursing coverage 24 hours a day, seven days a week," so the jailers' training was sufficient. 796 F. App'x at 864. Those jailers could immediately contact medically trained staff, so first aid and CPR training was sufficient to bridge the short gap between contacting a medical professional and medical treatment. *Not so here, where a detainee was almost wholly reliant on the jailers for medical care.*

*See id.,* 60 F.4th at 324 (emphasis added).

As in *Helphenstine*, in this case Muterspaw provided staff with no training at all by which to determine what constituted a serious medical need, or when urgent care was required for a "medical emergency." In 2017, Dr. Kaiser provided only a one-hour CPR training session that did not cover factors that would inform an officer's judgment on those issues. (Doc. 51, PageID 588-589).[28] Although Dr. Kaiser testified that he included "discussions about vital signs," (*id*., PageID 590), Vance did not recall anything beyond CPR training. (Doc. 56, PageID 788). In any event, there is no evidence that staff actually took Plaintiff's vital signs or recorded any other observations that would inform their discretion on whether or when to consult with medical staff, other than a minimal notation that Plaintiff was moved to an observation cell.

Construing the evidence in Plaintiff's favor, the undersigned recommends denial of Muterspaw's motion for summary judgment in his official capacity. Unlike in *North* or *Winkler*, Gibson did not consult with medical staff when Plaintiff first alerted him that he was ill, nor did Gibson or other staff quickly do so when Plaintiff's cellmate reported significant symptoms. On Thursday afternoon, officers again concluded that no medical or supervisory attention was required despite moving Plaintiff to an observation cell.

---

[28]Attendance at the CPR class was mandatory but for staff who were "covering the jail" at the time. (*Id*., PageID 590).

The City will likely protest that there was no physician at all on-site in *Helphenstine*, whereas Dr. Kaiser was on site about 8 hours per week, generally on weekends or holidays. In addition, Dumouchelle testified that she worked 10-15 hours a week. But as in *Helphenstine*, Plaintiff has produced evidence that correctional officers were expected to exercise considerable independent judgment to determine whether any emergency existed. (*See* Doc. 50 at PageID 507, testimony by Gibson that he would generally exercise common sense and "*if you felt it necessary* [would]… contact your sergeant and get them medical help.") (emphasis added). The City provided no training to help officers exercise that judgment. (*See* Doc. 51, PageID 596).

> At bottom, it appears that defendants were not trained on how to identify or address a medical emergency. A jury could easily conclude that this training program, to the extent that it existed, was insufficient.

*Helphenstine*, 90 F.4th at 325.

Plaintiff has come forward with sufficient evidence that the City's inadequate training amounted to deliberate indifference,[29] because the risk in delegating to untrained jail employees the task of determining when to contact medical staff, and whether a medical emergency existed, was "patently obvious." *Id.* Last, Muterspaw does not appear to dispute that Plaintiff can prove that the City's failure to train correctional officers on when to consult with medical personnel or to declare a medical emergency was closely related to or actually caused his injury.

## V.    Conclusion and Recommendations

For the reasons discussed, **IT IS RECOMMENDED THAT**:

---

[29]While the undersigned has recommended summary judgment on qualified immunity grounds for all Defendants except Dumouchelle, municipality liability for deliberate indifference is not dependent on a finding of individual liability. *See Winkler v. Madison Cnty.*, 893 F.3d 877, 900-901 (6th Cir. 2018).

1. Dumouchelle's motion for summary judgment (Doc. 59) be **DENIED**;

2. The Middletown Defendants' motion for judgment (Doc. 60) be **GRANTED in part**:

   a. The motion should be **GRANTED** as to all claims brought against Defendants Smith, Brewer, Lambert, Lakes, Downing, Mann and Marksbury;

   b. The motion should be **GRANTED** as to Plaintiff's Third Cause of Action against Defendant Gibson;

   c. The motion should be **GRANTED** as to all claims against Defendant Muterspaw in his individual capacity;

   d. The motion should be **GRANTED** as to all claims against Defendants Vance and Gibson in their individual capacities;

   e. The motion should be **DENIED** as to Plaintiff's deliberate indifference claim against Defendant Dumouchelle in her individual capacity, as well as for Plaintiff's claim against Muterspaw in his official capacity.

                                                      _s/Stephanie K. Bowman_____
                                                      Stephanie K. Bowman
                                                      United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JAARON M. STURGILL, II,

      Plaintiff,

  vs

RODNEY MUTRESPAW, et al.,

      Defendants

Case No. 1:19-cv-594

Hopkins, J.
Bowman, M.J.

**NOTICE**

Under Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** after being served with a copy thereof. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).