**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| JAARON M. STURGILL, II, | : |
| *Plaintiff,* | : |
| | : Case No. 1:19-cv-00594 |
| v. | : |
| | : Judge Jeffery P. Hopkins |
| RODNEY MUTERSPAW, *et al.*, | : |
| | : |
| *Defendants.* | : |

## OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION

This matter is before the Court on the Report and Recommendation ("Report" or "R&R") (Doc. 71) issued by Chief Magistrate Judge Stephanie K. Bowman on August 22, 2024. The Magistrate Judge recommends that Defendants' Motions for Summary Judgment (the "Motions") be granted in part and denied in part.[1] *Id.* at PageID 1052. Defendants Tara Dumouchelle and Rodney Muterspaw (collectively, "Defendants") have filed objections to the portions of the Motions that the Magistrate Judge denied. Docs. 76, 77.

For the reasons set forth below, the Court **OVERRULES** Defendants' objections and **ADOPTS** the Report and Recommendation (Doc. 71) in its entirety.

---

[1] Magistrate Judge Bowman recommended that: 1) Dumouchelle's Motion for Summary Judgment (Doc. 59) be DENIED; 2) the Middletown Defendants' Motion for Summary Judgment (Doc. 60) be GRANTED in part: a) GRANTED as to all claims brought against Defendants Smith, Brewer, Lambert, Lakes, Downing, Mann and Marksbury; b) GRANTED as to Plaintiff's Third Cause of Action against Defendant Gibson; c) GRANTED as to all claims against Defendant Muterspaw in his individual capacity; d) GRANTED as to all claims against Defendants Vance and Gibson in their individual capacities; e) DENIED as to Plaintiff's deliberate indifference claim against Defendant Dumouchelle in her individual capacity, as well as for Plaintiff's claim against Muterspaw in his official capacity. Doc. 71, PageID 1092.

## I.     FACTUAL BACKGROUND

Plaintiff Jaaron M. Sturgill, II, ("Plaintiff" or "Sturgill"), was born in Hamilton, Ohio in 1996. Compl., Doc. 1, ¶ 10. By any measure, his childhood and early adult life was difficult. But the portion of his story that is relevant to the instant case begins when Plaintiff was 20 years old, "by which time he had been addicted to heroin for about three years." Doc. 71, PageID 1052. On Tuesday, July 25, 2017, and while under the intoxicating effects of methamphetamine and heroin, Sturgill was arrested in Middletown, Ohio and taken to the Middletown City Jail (the "Middletown Jail" or "Jail"). *Id.* at PageID 1055. What occurred over the next three days while Plaintiff was at the Jail is *heavily* disputed between the parties. And the Court sees no need to recite again the timeline of events that the Magistrate Judge so commendably and meticulously recounted in the R&R.

But this remains true: within 63 hours of Plaintiff's arrival at the Jail, he was found unresponsive while in a medical observation cell and was later transported to a nearby hospital. *Id.* at PageID 1052. He survived this ordeal but was eventually diagnosed with a number of serious conditions, including sepsis and endocarditis, followed by an extended period of hospitalization and rehabilitation. *Id.* He requires ongoing treatment and care. *Id.*

## II.     LAW AND ANALYSIS

A district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3). Review applies only to "any portion to which a proper objection was made." *Richards v. Colvin*, No. 2:12-cv-748, 2013 WL 5487045, at *1 (S.D. Ohio Sept. 30, 2013). If presented with a proper objection, "[t]he district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the

matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3). General or unspecific objections are treated the same as a failure to object. *Slater v. Potter*, 28 F. App'x 512, 513 (6th Cir. 2002) ("The filing of vague, general, or conclusory objections does not meet the requirement of specific objections and is tantamount to a complete failure to object."); *see Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Having carefully reviewed the comprehensive findings and conclusions of the Magistrate Judge and considered *de novo* all filings in this case, with particular attention to the issues as to which Defendants lodged objections, the Court determines that the Report and Recommendation should be adopted in its entirety.

### A. Plaintiff's Section 1983 Claim Against Defendant Tara Dumouchelle in her Individual Capacity (Count Four)

#### i. Background

Plaintiff sued Defendant Tara Dumouchelle ("Dumouchelle") and others alleging deliberate indifference to a serious medical need in violation of his Fourteenth Amendment rights while he was incarcerated at the Middletown Jail from July 25, 2017 to July 28, 2017. Doc. 71, PageID 1065–66. Despite evidence to the contrary, Plaintiff claims that "[a]t no time" did Dumouchelle provide any nursing services to him throughout the period of his detention at Middletown Jail. Doc. 1, ¶ 59. Plaintiff maintains that a sick call note dated July 26, 2017 was "fabricated" after Plaintiff had been transferred from the jail to the hospital "to make it falsely appear that [Plaintiff's] request for medical assistance had been responded to but that he refused any help." *Id.* ¶ 63. He asserts that Dumouchelle ignored his symptoms and doctored the records "to memorialize a meeting with [Plaintiff] that never occurred." *Id.* ¶¶ 64, 65. Thus, Plaintiff argues that Dumouchelle acted in "wanton disregard of [his] clearly

established right" either "to be free from deliberate indifference to his serious medical needs or to conceal the other [D]efendants' unconstitutional conduct." *Id.* ¶ 66.

Dumouchelle rejects these allegations. Dumouchelle insists that she "rendered appropriate and timely medical care with a screening examination upon Plaintiff's Jail admission [on July 25, 2017] and a 'sick call' examination" on the morning of Thursday, July 27, 2017. Doc. 71, PageID 1075. Dumouchelle maintains that she "wrote a fairly detailed note reflecting her assessment [of Plaintiff] at the time" and that she "acted appropriately, within standards of care and was not in any way deliberately indifferent to a serious medical need under any standard." Doc. 76, PageID 1134–35. In fact, so confident is Dumouchelle in her belief that she provided adequate care that she has moved for summary judgment on this claim. *See* Doc. 59. She avers that "there is no actual, competent evidence that Dumouchelle denied medical care to Sturgill." *Id.* at PageID 879. To the contrary, as she posits, "the record establishes that Dumouchelle assessed Sturgill appropriately and appropriately responded based on her assessment and her knowledge, training, and experience." *Id.* at PageID 879.

The Magistrate Judge disagreed. The Magistrate Judge found that the evidence and discrepancies in the record were "sufficient to create a triable issue on whether Dumouchelle examined Sturgill on Thursday [July 27] morning and/or created an accurate record of that exam." Doc. 71, PageID 1076. In coming to this conclusion, the R&R relied on a "more lenient" standard for deliberate indifference articulated in *Brawner v. Scott Cnty., Tennessee*. 14 F.4th 585 (6th Cir. 2021); *see Lawler v. Hardeman Cnty.,* 93 F.4th 919, 928 (6th Cir. 2024) (explaining that *Brawner* adopted a "more lenient test" than prior caselaw when analyzing pretrial detainees' deliberate indifference claims under the Fourteenth Amendment). Pursuant

to *Brawner*, a detainee need only show that (1) he "had a sufficiently serious medical need[,] and (2) that [the] defendant 'acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 317 (6th Cir. 2023) (quoting *Brawner*, 14 F.4th at 596) (cleaned up). In other words, "a pretrial detainee must have a serious medical need, and the defendant must act, whether through intentional action or omission, recklessly in response to the need and the risk it presented to the detainee." *Grote v. Kenton Cnty., Kentucky*, 85 F.4th 397, 405 (6th Cir. 2023) (citing *Helphenstine*, 60 F.4th at 317).

Viewing all evidence in the light most favorable to the non-movant, the Magistrate Judge relied on *Brawner* to deny Dumouchelle's Motion for Summary Judgment. First, the Magistrate Judge meticulously recounted the timeline of Plaintiff's deteriorating condition to determine that "a reasonable jury could conclude that Plaintiff had [an objectively] serious medical need by Wednesday [July 26] afternoon that required some level of medical attention." *See* Doc. 71, PageID 1066–71. Next, the Magistrate Judge found that "if [Dumouchelle] ignored [a] request to examine Plaintiff on Thursday [July 27] morning, or if she falsely recorded that he was asymptomatic and refused medical attention, then her conduct would satisfy the subjective element of Plaintiff's claim" for deliberate indifference. *Id*. at PageID 1076–77. Finally, the Magistrate Judge concluded that Dumouchelle was "not entitled to qualified immunity" because a "reasonable jury could conclude that, as a medical professional, [Dumouchelle] knew that Plaintiff required medical attention by no later than Thursday [July 27] morning, but deliberately disregarded that serious need either by failing to examine [Plaintiff] at all, and/or by fabricating a record that falsely stated that he had no symptoms." *Id*. at PageID 1080.

Dumouchelle timely objected to these findings. Doc. 76. Dumouchelle maintains that she is "entitled to summary judgment on Plaintiff's constitutional claims against her because no reasonable jury could find that she acted with deliberate indifference to a serious medical need." *Id.* at PageID 1131. Dumouchelle asserts that "the magistrate judge erred by misapplying the appropriate standard to the facts of this case in concluding that (1) a reasonable juror could find that Plaintiff satisfied both the objective and subjective elements of Plaintiff's claim of deliberate indifference against Dumouchelle[,] and (2) Dumouchelle is not entitled to qualified immunity." *Id.*

### ii. Deliberate Indifference

Defendant Dumouchelle submits that the R&R's characterization of the dual-pronged standard in *Brawner* "is fundamentally flawed." *Id.* at PageID 1137. Dumouchelle claims that "[t]he evolving, unclear urgency" of Plaintiff's condition throughout his detention and his "continued observation" hours after his examination on July 27 proves that "no reasonable juror could conclude that Sturgill had an *objective*, serious medical need on the morning of July 27." *Id.* at PageID 1143 (emphasis added). Therefore, because "Plaintiff's condition was not 'obvious' . . . until Thursday, July 27 at 1:00 p.m.— hours after Dumouchelle's visit," on "this basis alone" is Dumouchelle "entitled to summary judgment." *Id.* at PageID 1143–44.

Further, Dumouchelle alleges that even if she *subjectively* "'missed' signs of a serious medical condition, that could be evidence of negligence," which is otherwise insufficient to establish a claim for deliberate indifference. *Id.* at PageID 1144–45. She asserts that her "note and testimony" following her examination of Plaintiff on July 27 does "not establish deliberate indifference or reckless conduct in the fact [*sic*] of an *unjustifiably high risk of harm.*" *Id.* at PageID 1145. She also posits that Plaintiff's allegation that she "completely fabricated

her note" on July 27 is "pure speculation . . . insufficient to withstand summary judgment." *Id*. at PageID 1147 (cleaned up). Under these facts, Dumouchelle asserts that "no reasonable juror could conclude that [she] acted with deliberate indifference." *Id*. at PageID 1138.

This Court is unconvinced by Dumouchelle's objections. This Court begins by framing its analysis in relation to the current procedural posture of this case: summary judgment. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

This Court holds that the Magistrate Judge properly denied summary judgment as to Dumouchelle's claims. The Magistrate Judge painstakingly recounted several points of genuine factual dispute that militate against Dumouchelle's argument that summary judgment—and not submitting these matters to a jury—is appropriate. *See generally* Doc. 71, PageID 1056–62. *First*, as it relates to the objective element articulated in *Brawner*, Dumouchelle submits that the "evolving, unclear urgency" of Plaintiff's medical need could not have been, as a matter of law, "objectively, sufficiently serious." Doc. 76, PageID 1143. In support of this proposition, Dumouchelle maintains that "the most [she] knew that morning [July 27] was that Officer Gibson stated [Plaintiff] was complaining of not eating or drinking . . . ." *Id*. Thus, because the extent of Dumouchelle's knowledge of Plaintiff's condition was simply what the officers told her, "no reasonable juror could conclude that Sturgill had an objective, serious medical need." *Id*.

That argument is unavailing. In essence, Dumouchelle seeks to make the "serious-medical-need prong [under *Brawner*] coextensive with [her] own understanding of the situation and reaction to it." *Grote*, 85 F.4th at 407. This exact argument was rejected by the Sixth Circuit in *Grote*. *See id.* ("The district court appears to have conflated the more subjective element of a deliberate-indifference claim with its objective element in reaching the opposite conclusion—that [the plaintiff] did not have a serious medical need until he visibly suffered . . . in his cell."). *Brawner* "lowered the standard for deliberate-indifference claims by pretrial detainees like" Sturgill. *Whyde v. Sigsworth*, No. 22-3581, 2024 WL 4719649, at *2 (6th Cir. Nov. 8, 2024) (citing *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 315–16 (6th Cir. 2023)). Today, officers[2] can face liability "even if they did not *actually* know of a risk of harm to a pretrial detainee." *Lawler*, 93 F.4th at 927. Pretrial detainees "need only prove that the officers *recklessly disregarded* a risk so obvious that they either knew or *should have known of it*." *Id.* (emphasis added). Therefore, Dumouchelle's exclusive focus on the extent of her knowledge on the morning of July 27 misses the point. At this stage of the inquiry, what she *personally* was made aware of does not matter to the underlying question of whether Plaintiff had an objectively serious medical need.

This Court further holds that a reasonable jury could conclude that Plaintiff had an objectively serious medical need even before July 27. An objectively serious medical need is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Martin v.*

---

[2] Private companies (and their employees) that perform traditional state functions, such as providing medical care to inmates, are state actors "for the purposes of § 1983." *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (citing *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008)). Common law tort principles govern causation in the § 1983 context. *Powers v. Hamilton Cty. Pub. Defender Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007) (citing *McKinley v. City of Mansfield*, 404 F.3d 418, 438 (6th Cir. 2005)). Thus, Dumouchelle is an officer within the meaning of § 1983, and her actions are assessable under that statute.

*Warren Cnty., Kentucky*, 799 F. App'x 329, 338 (6th Cir. 2020) (cleaned up). Here, Plaintiff has presented sufficient evidence that he had a medical need so serious that even a layperson could easily have "recognize[d] the necessity for a doctor's attention." *Id.* On July 26, one day before the alleged examination with Dumouchelle, Plaintiff had a court hearing and met with his lawyer, Kathleen Batliner. At that time, Plaintiff told Ms. Batliner that he had "severe pain in his legs, wrists, and shoulders." Kathleen Batliner Dep., Doc. 54, 12:3–4. Batliner herself observed that Sturgill could "hardly stand up," had to be assisted in and out of his chair by the court liaison officer, had to "hold onto the counter" in front of the judge during the hearing, had spots on his hands, and "could barely move." *Id.* at 12:8–9; 13:3–5; 15:10–15. Based on Plaintiff's complaints and her belief that Plaintiff had an "obvious" need for medical attention, Batliner requested the judge presiding over the state court case to release Plaintiff on an OR bond so that he could immediately go to the emergency room for treatment. *Id.* at 15:16–20. That request was ultimately denied for unknown reasons. *Id.* Nonetheless, Batliner had informed the judge that Plaintiff was in severe pain, and the judge confirmed with Plaintiff that he had previously "requested medical assistance while in [J]ail with the [J]ail nurse." *Id.* at 17:13–16.

In addition to this evidence, Plaintiff's cellmate, Aaron Smith, testified in a deposition that he witnessed Plaintiff's condition deteriorate throughout the course of their detention together and that he had called out to authorities for medical attention on at least four (4) occasions. After Plaintiff's return from his court appearance on July 26 and while they were sharing a cell together, Smith recalled that Plaintiff "wasn't looking good," that "his speech wasn't all the way there," that when he was "trying to talk . . . no words were coming out," and that "he wasn't moving real quick." Aaron Smith Dep., Doc. 49, 21:6–11; 99:17–21. At

one point, Smith even had to help Plaintiff stand up to urinate. *Id*. at 81:24–25. These visible indications of Plaintiff's physical distress led Smith to make "at least . . . four" (4) verbal requests to corrections officers for Plaintiff to be seen by a nurse. *Id*. at 81:8. Thus, Plaintiff has submitted at least *two* different streams of evidence by laypersons that tend to establish that he had an objectively serious medical need by July 26.

Dumouchelle posits that by the time she allegedly examined Plaintiff the following morning on July 27, Plaintiff was "[n]euro[logically] intact," "walking without difficulty," was "seen eating [his] tray," and had recorded that Plaintiff did "not want to talk to [a] nurse" even after being asked "multiple times." Doc. 56, PageID 830. Within hours after this alleged examination occurred, however, two corrections officers entered the jail cell and attempted to assist Plaintiff to his feet, at which point "he just immediately fell to the ground." Aaron Smith Dep., Doc. 49, 23:9. The two officers then decided to move Plaintiff to an observation cell due to his worsening symptoms. Doc. 60, PageID 950. And, as the Magistrate Judge noted, the "decision to transfer Plaintiff to an 'observation cell' is itself evidence that Plaintiff had an objectively serious medical need by around 1 p.m. Thursday [July 27]." Doc. 71, PageID 1071 (citing *Helphenstine*, 60 F.4th at 318) (placing a pretrial detainee in an observation cell based on his medical condition "tends to show a sufficiently serious medical need."); *see also Blackmore v. Kalamazoo Cnty*., *Michigan*, 390 F.3d 890, 899 (6th Cir. 2004) (same).

It well could be the case, as Dumouchelle argues, that the "most [she] knew that morning [of July 27] was that Officer Gibson stated [Plaintiff] was complaining of not eating or drinking." Doc. 76, PageID 1143. But to thereafter assert that, because Dumouchelle did not *personally* perceive urgent symptoms, this definitively demonstrates that "no reasonable

juror could conclude that [Plaintiff] had an objective, serious medical need on the morning of July 27" is an erroneous conflation of the objective element with the subjective element of deliberate indifference. *Id*. Indeed, there were signs of Plaintiff's outward distress noticed by two separate laypersons (Plaintiff's lawyer and his cellmate) on July 26—one full day before the alleged examination occurred. Plaintiff demonstrated that there were clear indications of either a drug overdose or severe withdrawal. *See, e.g.*, *Hinneburg v. Miron*, 676 F. App'x 483, 484, 486 (6th Cir. 2017) (finding that "the extreme nature of [the inmate's] intoxication" met the objective component where other inmates testified that that the inmate was "visibly high," "nodding out and talking to herself," and repeatedly dropped her head); *Border v. Trumbull Cnty. Bd. of Comm'rs*, 414 F. App'x 831, 837–38 (6th Cir. 2011) (finding that a detainee's medical need was sufficiently serious and obvious where he appeared "severely intoxicated," "huddled and slumped over," had red and glazed eyes, "had difficulty walking and staying awake," and "slurr[ed] his speech"); *Bertl v. City of Westland*, No. 07-2547, 2009 WL 247907, *5–6 (6th Cir. Feb. 2, 2009) (finding that an inmate who later died of severe alcohol withdrawal had "visibly serious medical condition" that "satisfied the objective component" where he was "lying face down on the floor of his cell, almost comatose, unresponsive and having seizure-like spasms"). And even the deputies themselves recognized the need for medical observation by moving Plaintiff into an observation cell just a few hours after the (alleged) July 27 examination. Doc. 60, PageID 950. These are tell-tale signs that "constitute the hallmarks of an objectively serious medical need." *Grote v. Kenton Cnty., Kentucky*, 85 F.4th 397, 407 (6th Cir. 2023). Thus, a reasonable jury could conclude that Plaintiff had a serious medical need by July 26 that required some level of medical attention.

*Second*, as it relates to *Brawner*'s subjective component, Dumouchelle argues that her actions "do not establish deliberate indifference or reckless conduct in the fact of an *unjustifiably high risk of harm*." Doc. 76, PageID 1145. Dumouchelle posits that her "detailed" examination note and her deposition testimony regarding her examination methodology "establish anything but a cursory examination" of Plaintiff on July 27. *Id.* at PageID 1144. And Dumouchelle maintains—without citing to any caselaw—that even if she "failed to appreciate or 'missed' signs of a serious medical condition, that could be evidence of negligence," not deliberate indifference. *Id.* at PageID 1144–45.

This element poses a closer call. But precisely *because* it is a close call does it justify the Magistrate Judge's conclusion that Dumouchelle is not entitled to summary judgment. The Magistrate Judge determined there were multiple discrepancies in the record sufficient to create triable issues of material fact on whether Dumouchelle "*recklessly disregarded* a risk so obvious that [she] either knew or should have known of it." *See* Doc. 71, PageID 1076–77; *Lawler*, 93 F.4th at 927. Plaintiff provided deposition testimony of his cellmate, Aaron Smith, attesting that "Dumouchelle did not examine Plaintiff at *any* time that he shared a cell with Sturgill, including Thursday morning [July 27]." Doc. 71, PageID 1076. Plaintiff pointed out that Officer Gibson "had no recollection of asking a nurse to see Plaintiff or of accompanying Dumouchelle to Plaintiff's cell." *Id.* at PageID 1059. While Dumouchelle herself claimed that she went to Plaintiff's cell on *July 27, 2017*, the note reflecting the alleged visit was dated to *July 26, 2017*—despite Dumouchelle's testimony that Plaintiff allegedly informed her of "the correct date" when she allegedly examined him. *Id.*; Tara Dumouchelle Dep., Doc. 45, 41:24. Notably, that same examination note does not contain Plaintiff's signature, even where there is a line specifically designated for an "inmate[']s signature." Doc. 56, PageID 830. Further,

"Dumouchelle's recorded observations that she observed Plaintiff eating from his meal tray while sitting on a bunk [were] inconsistent with his mattress being on the floor, as well as evidence that breakfast trays would have been retrieved hours before her exam." Doc. 71, PageID 1076 (citations omitted). While these discrepancies may not conclusively establish that Dumouchelle was deliberately indifferent to Plaintiff's serious medical need *per se*, neither do these discrepancies vindicate Dumouchelle's position that she performed a thorough medical examination—if indeed she conducted one at all. Doc. 76, PageID 1144. For where, as here, the medical need is obvious, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002) (citations omitted).

Dumouchelle seeks to justify her subjective belief that Plaintiff was not suffering from an objectively serious medical need by claiming that Plaintiff's symptoms are typical "in circumstances in which we are 36–48 hours in for an inmate who shot up heroin and had bad meth." Doc. 71, PageID 1145. Therefore, as Dumouchelle argues, if she missed Plaintiff's symptoms "under these circumstances," this "would at most be mere negligence, which is insufficient to satisfy the subjective element of Plaintiff's claim." *Id*. But, as was the case in *Grote*, Dumouchelle's "'withdrawal' defense fails." *Grote*, 85 F.4th at 409. Here, the need for medical attention based on Plaintiff's severe symptoms "was obvious even to non-medical professionals," and Dumouchelle's failure to properly "appreciate that risk does not mean that she did not act recklessly." *Id*.

Under these circumstances, a reasonable jury could conclude that either Dumouchelle ignored Gibson's request to examine Plaintiff on Thursday morning, or that Dumouchelle falsely recorded Plaintiff's symptoms and that he refused medical attention. Viewing the facts

in the light most favorable to Plaintiff, under both theories, Dumouchelle's conduct or inaction could satisfy the subjective element of Plaintiff's allegations. Therefore, the Magistrate Judge properly denied summary judgement as to this claim of deliberate indifference against Dumouchelle.

### iii. Qualified Immunity

Dumouchelle's next objection relates to the Magistrate Judge's denial of her claim that she is entitled to qualified immunity. Doc. 76, PageID 1131. Dumouchelle maintains that Plaintiff failed to overcome her claim of qualified immunity because he failed to show "(1) that Dumouchelle violated [Plaintiff's] constitutional rights and (2) the right was clearly established." *Id.* at PageID 1147. But that argument implies that medical providers who contract with state institutions can even invoke the defense of qualified immunity when they are defendants in § 1983 claims.

Not so here. Medical providers who contract to provide medical services to prison inmates indeed act under color of state law for purposes of § 1983. *West v. Atkins*, 487 U.S. 42, 54 (1988); *see also Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008) ("As an initial matter, it is undisputed that [d]efendant nurses are subject to suit under § 1983 because they acted 'under color of state law.'"). But being subject to suit under § 1983 "does *not* mean that a party has the right to assert qualified immunity." *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008) (emphasis added).

The Supreme Court has carved out areas of immunity from suit where the "tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine." *Wyatt v. Cole*, 504 U.S. 158, 164 (1992) (cleaned up). As it relates to medical

providers who contract to perform medical services at jails and prisons, "the absence of any indicia that a paid physician [or nurse] . . . would have been immune from suit at common law, convince us that there was no common-law tradition of immunity for a private doctor [or nurse] working for a public institution at the time that Congress passed § 1983." *McCullum v. Tepe*, 693 F.3d 696, 704 (6th Cir. 2012). Thus, because "there does not appear to be any history of immunity for a private doctor [or nurse] working for the government, . . . the policies that animate our qualified-immunity cases do not justify our creating an immunity unknown to the common law." *Id*. "Nor do the policy rationales undergirding qualified immunity counsel in favor of extending immunity to [d]efendant nurses." *Harrison v. Ash*, 539 F.3d 510, 522 (6th Cir. 2008). Therefore, as the Sixth Circuit has established, "[n]urses employed by a private medical provider . . . are not entitled to assert qualified immunity." *Howell v. NaphCare, Inc.*, 67 F.4th 302, 317 n.4 (6th Cir. 2023) (citing *Harrison*, 539 F.3d at 524) ("[W]e find that the purposes of qualified immunity do not support the extension of the doctrine to nurses employed by a private medical provider.").[3]

Here, it is uncontested that Dumouchelle is a private citizen employed by Kaiser Medical Corporation. Doc. 78, PageID 1169. She provided nursing services to the Middletown Jail on a part-time, 12–15 hours per week basis. *Id.* As in *Howell*, Dumouchelle who is "employed by a private medical provider," *Howell*, 67 F.4th at 317 n.4, is "not entitled

---

[3] The Sixth Circuit is not alone in denying qualified immunity to private medical providers who contract with jails and prisons. *See Jensen v. Lane County*, 222 F.3d 570, 580 (9th Cir. 2000) (finding that policy justifications for qualified immunity do not support the availability of the defense to private psychiatrist that contracted with a county-run hospital); *Halvorsen v. Baird*, 146 F.3d 680, 685–86 (9th Cir. 1998) (finding that private non-profit organization that contracted with municipality to provide involuntary detoxification services could not assert qualified immunity); *Rosewood Services, Inc. v. Sunflower Diversified Services*, 413 F.3d 1163, 1169 (10th Cir. 2005) (finding that policy considerations did not justify extending qualified immunity protection to a non-profit firm that was under contract with the government to provide services to developmentally disabled individuals); *Hinson v. Edmond*, 192 F.3d 1342, 1347 (11th Cir. 1999) (holding that a privately employed jail physician was ineligible for a qualified immunity defense).

to assert qualified immunity." *Id.* (citing *Harrison*, 539 F.3d at 524). Thus, the Magistrate

Judge properly denied summary judgment on Dumouchelle's qualified immunity argument.

### B. Plaintiff's Section 1983 Claim Against Defendant Rodney Muterspaw in his Official Capacity as Chief of the Middletown Division of Police (Count Five)

#### i. Background

Plaintiff alleges that Rodney Muterspaw ("Muterspaw")—more accurately, the City

of Middletown ("Middletown")[4]—failed "to provide adequate training to the corrections

officers working in the [J]ail to ensure that [J]ail detainees received adequate treatment for

medical conditions from which the detainees were suffering." Doc. 1, ¶ 69. Plaintiff points to

Middletown Jail Policy § 9.8.2 (the "Policy") and other testimony of record in support of his

failure-to-train claim.[5] The referenced Policy states that inmates are permitted "to report

personal illness at any time of the day and emergency medical conditions whenever they

occur," and that "[t]he staff will ensure they receive adequate treatment for these medical

conditions." Doc. 51, PageID 609. Plaintiff posits that even though staff were expected to

---

[4] "It is well-settled that a claim against an officer or employee of a governmental entity, in his or her official capacity, is a claim against the governmental entity itself." *Brunson v. City of Dayton*, 163 F. Supp. 2d 919, 927 (S.D. Ohio 2001) (citing *Kentucky v. Graham*, 473 U.S. 159 (1985)). Muterspaw is no longer the Chief of the Middletown Division of Police; nonetheless, these allegations remain against the City of Middletown itself. Doc. 77, PageID 1154.

[5] The Policy reads, in relevant part:

Emergency medical treatment for all inmates of the Middletown City Jail shall be provided 24 hours a day through the Atrium Medical Center Emergency Room. A medical emergency includes, but is not limited to, the following: profuse bleeding, severe pain, unconsciousness, severe head injury, chest pains, difficulty breathing, severe burns, or psychotic behavior which presents a danger to the inmate or others . . . .

. . . If a medical emergency occurs in the jail, jail staff will immediately call for an emergency squad, and the onduty Shift Commander, or in his absence, the senior Sergeant and the jail nurse will be notified at once. If the staff member receiving the complaint is unsure as to the seriousness of the complaint, the ranking supervisor will be contacted as well as the jail nurse. The jail nurse will make the decision as to the seriousness of the complaint. If the jail nurse does not respond within 15 minutes, the ranking supervisor will assess the situation and take appropriate action. Jail staff will administer first aid when appropriate.

§ 9.8.2(A)–(A)(1). Doc. 51, PageID 610.

exercise considerable judgment in making those determinations, "corrections officers did not receive the adequate training they needed to see that [Plaintiff] received the medical care he needed." Doc. 71, PageID 1085 (internal citations omitted). The crux of Plaintiff's claim is that, in the absence of additional training, "the breadth of discretion afforded to non-medical staff [at the Middletown Jail] as the gatekeepers for pretrial detainees to obtain medical care" caused him the harm for which he now petitions this Court for relief. *Id.*

Defendant Muterspaw asserts that Plaintiff cannot prove that an official Middletown policy or custom resulted in the alleged violation of his rights. Doc. 60, PageID 925. Muterspaw avers that "there is no evidence in the record that establishes that any corrections officer working in the Middletown Jail while Plaintiff was an inmate there was ever told that Plaintiff was in 'severe pain.'" *Id.* Therefore, "Plaintiff cannot establish that the Middletown Defendants failed to act on Plaintiff's alleged report of 'severe pain' because that information was never communicated to them." *Id.* at PageID 926. Furthermore, Muterspaw maintains that the "correction officers in Middletown were adequately trained." *Id.* Thus, because Middletown "trained its corrections officers to provide basic first aid, CPR, and similar services, to respond to complaints from inmates about medical issues, and to report serious medical problems to the jail nurses and doctor," Muterspaw argues that "reasonable minds can only conclude that Middletown was not deliberately indifferent to Plaintiff and did not violate Plaintiff's [c]onstitutional rights by allegedly failing to train its corrections officers." *Id.* at PageID 927.

The Magistrate Judge rejected Muterspaw's arguments. In the R&R, the Magistrate Judge reasoned that Plaintiff's claim did "not rely on the knowledge [by corrections officers] of his severe pain" but turned on whether "the Jail was required to train officers 'to recognize

situations where an inmate is demonstrating obvious signs of being . . . in need of medical assistance.'" Doc. 71, PageID 1084–85 (quoting Doc. 1, ¶ 73). Thus, the Magistrate Judge found that Plaintiff had proffered sufficient evidence from which a reasonable jury could conclude that the City's inadequate training "amounted to deliberate indifference, because the risk in delegating to untrained jail employees the task of determining when to contact medical staff, and whether a medical emergency existed, was 'patently obvious.'" Doc. 71, PageID 1091 (citing *Helphenstine*, 90 F.4th at 325).

Muterspaw objects to the R&R to the extent that it: (1) concludes that Plaintiff "c[a]me forward with sufficient evidence that [Middletown's] inadequate training amounted to deliberate indifference[;]" and (2) "recommend[ed] that the Middletown Defendants' Motion for Summary Judgment . . . should be denied as to Plaintiff's deliberate indifference claim against Middletown." Doc. 77, PageID 1152 (cleaned up). Muterspaw posits that the Middletown Jail corrections officers were properly trained and indeed followed standard protocol, which "was for the officers to talk with inmates making medical complaints, provide the inmates with a medical form to complete and which the officers would then place in the nurse's box, and to escalate the issue to a supervisor or directly to the medical staff depending on the circumstances presented." *Id.* at PageID 1159. Further, Muterspaw emphasizes that "Plaintiff has not come forward with any evidence to demonstrate how" an alleged failure-to-train corrections officers "made a potential constitutional violation obvious." *Id.* at PageID 1160. Ultimately, Muterspaw "disagree[s] with the Magistrate Judge's reliance on *Helphenstine* to support [the Magistrate Judge's] recommendation that Middletown be denied a summary judgement on Plaintiff's *Monell* claim." *Id.* at PageID 1161–62.

18

ii.    **Legal Framework**

The Court begins by offering a few observations about the correct legal framework required to analyze Plaintiff's failure-to-train claim against Middletown. "A municipality is a 'person' under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible." *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 565 (6th Cir. 2018) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978)). This requires Plaintiff to demonstrate that the alleged federal violation occurred because of a municipal "policy or custom." *Monell*, 436 U.S. at 694. This requirement may allow a municipality to be held liable under one of four recognized theories: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

Here, Plaintiff's claim against Middletown alleges a failure to adequately train Jail staff. Notably, a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). There are two recognized ways to support a claim that a failure-to-train or failure-to-supervise is the result of a municipality's deliberate indifference. Plaintiff may either prove (1) a "pattern of similar constitutional violations by untrained employees," *or alternatively*, (2) "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738–39 (6th Cir. 2015) (internal quotation marks omitted); *see also Grote v. Kenton Cnty., Kentucky*, 85 F.4th 397, 414

19

(6th Cir. 2023) (holding that it is "proper to consider possible constitutional violations committed by a municipality *qua* municipality, even in the absence of a showing of a constitutional violation by any one individual officer"). Because Plaintiff has not identified any other constitutional violations, he must demonstrate that the deliberate indifference to his serious medical need was a result of the Middletown Jail's "failure to train the [J]ailers to handle this potentially recurring situation." *Helphenstine*, 60 F.4th at 323.

### iii. Analysis

With this framework in mind, the question before the Court is whether Middletown Jail's failure to train its employees amounted to a deliberate indifference to Plaintiff's rights. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Such a claim has three elements. Plaintiff must show (1) that Middletown's "training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler v. Madison Cnty.*, 893 F.3d 877, 902 (6th Cir. 2018) (citation omitted).

*First*, as it relates to the adequacy of training program at Middletown Jail, this Court finds that a reasonable jury could reach a finding "that this training program, to the extent that it existed, was insufficient." *Helphenstine*, 60 F.4th at 324. Undoubtedly, there was potential harm to inmates that would necessitate training Jail staff to help identify similar risks as to what Plaintiff experienced and to mitigate the effects of any harm that might be visited upon them. Dr. George Kaiser, the Middletown Jail doctor,[6] testified that the Jail has

---

[6] While Dr. Kaiser is technically available by phone "24/7," he testified that he only spends about eight hours per month at the Jail. Doc. 71, PageID 1082. Dumouchelle testified that she worked 10–15 hours a week at the Jail. *Id.* at PageID 1091. Contrast this with the availability of jail medical personnel in *Berry v. Delaware Cnty. Sheriff's Off.*, 796 F. App'x 857, 864 (6th Cir. 2019) (holding that "the jail had 'nursing coverage 24 hours a day, seven days a week,' so the jailers' training was sufficient").

a "heavy population of people that are abusing drugs." George Kaiser Dep., Doc. 51, 26:2–3. "This reality is reflected in the [J]ail's policies." *Larrick v. Tuscarawas Cnty.*, No. 5:21-CV-00959, 2023 WL 6311396, at *29 (N.D. Ohio Sept. 28, 2023). The Middletown Jail Policy instructs Jail staff that "[e]mergency procedures are [to be] followed for inmates experiencing severe, life-threatening intoxication (overdose) or detoxification." Doc. 51, PageID 611. But, as in *Helphenstine*, the Policy contains "no instructions or guidelines for how [Jail] staff should care for an inmate in withdrawal," *Helphenstine*, 60 F.4th at 324, beyond simply "call[ing] for an emergency squad, and the on-duty Shift Commander . . . and [notifying] the [J]ail nurse." Doc. 51, PageID 610. Emphasizing this point, Dr. Kaiser further testified that he "provided only a one-hour CPR training session [to Jail staff] that did not cover factors that would inform an officer's judgment on those issues" relating to identifying the effects of drug intoxication or detoxification. Doc. 71, PageID 1090 (citing to George Kaiser Dep., Doc. 51, PageID 588, 14:18–20).

Despite this, Muterspaw—on behalf of the City—claims that Plaintiff has not presented evidence to support the "conclusion that Middletown failed to adequately train corrections officers working in the Jail." Doc. 77, PageID 1161. The record suggests otherwise. When asked whether the Jail gave corrections officers "criteria or guidelines to apply to [a] situation when an inmate requested assistance," Officer Gibson replied with "nothing particular other than if an inmate looked like he was in distress." Danny Gibson Dep., Doc. 50, 14:21–15:1. Given the gravity of the concern, one would expect that the Policy for the Middletown Jail would have provided guidelines and procedures to be followed in a medical emergency. But Officer Gibson—a Jail employee—testified that *he had never seen the Policy before. Id.* at 18:1–3. When asked whether he recalled "[r]eceiving any training

whatsoever as to what would constitute a medical emergency," Officer Gibson answered that he had not. *Id*. at 18:19–21. And although Dr. Kaiser testified that he had "discussions about vital signs" with corrections officers, (Doc. 51, 16:22–23), Officer Vance stated that the only specific training she received "regarding the provi[sion] of medical assistance to inmates" was "CPR classes." Linda Vance Dep., Doc. 56, 10:10–15. Thus, contrary to Muterspaw's assertions, there *is* more than sufficient evidence in the record to suggest that Middletown failed to *adequately* train corrections officers at the Middletown Jail.

*Second*, a reasonable jury could conclude that the inadequacy of the Policy and staff training was "the result of the [Middletown's] deliberate indifference to inmate health and safety." *Helphenstine*, 60 F.4th at 325. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of [the] action." *Connick*, 563 U.S. at 61 (cleaned up). If the "unconstitutional consequences of failing to train" employees are "patently obvious," the municipality "could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id*. at 64. In other words, a municipality could be held liable under § 1983 where the federal rights violation may have been "a highly predictable consequence of a failure to equip [employees] with specific tools" to handle potentially recurring situations. *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997). For example, "[a]sking employees to use professional judgment that lies outside their area of expertise may demonstrate deliberate indifference." *Helphenstine*, 60 F.4th at 325.

In this context, a reasonable jury could find that Middletown Jail's training program was so inadequate that it was "patently obvious" that a constitutional violation of an inmate's rights would result, as demonstrated by the inadequate response by Jail staff to Plaintiff's deteriorating medical condition in the events giving rise to the instant case. As discussed

above, Middletown was aware of risks to inmate health because the Jail had a section in its Policy dedicated to the "assessment, treatment, and observation of inmates manifesting symptoms of intoxication or detoxification from" drugs. Doc. 51, PageID 611. And the fact that the Policy included instructions of when to "notif[y]" Jail medical staff, (*id*.), "is proof that the [Jail] understood the serious consequences that could result from not appropriately treating inmates suffering from" drug intoxication or detoxification. *Larrick*, 2023 WL 6311396, at *30.

And yet, the evidence shows a "disconnect" between Middletown's recognition of the risks to inmate health associated with recurring problems with drug overdose and abuse and the policies needed to address these concerns "and the training necessary to put those policies to work." *Id.* Dr. Kaiser admitted he only performed a "once a year seminar . . . about an hour long" on the "medical aspects" of the responsibilities of Jail staff. Kaiser Dep., Doc. 51, 14:13–20. Officer Gibson confirmed that he merely "relied on [his] own sense of whether someone looked healthy or whether there was obvious injury in order to make [the] determination" that medical attention was needed. Gibson Dep., Doc. 50, 15:7–12. And Officer Vance similarly agreed that she relied on her own "common sense" and her training— CPR classes—to determine whether an inmate "[was] in pain or distress and need[ed] to be seen by medical people." Vance Dep., Doc. 56, 8:13–22.

But clearly such common sense, absent any comprehensive professional training or instruction to back it, was not enough. Officer Gibson "did not consult with medical staff when Plaintiff first alerted him that he was ill."[7] Doc. 71, PageID 1090. Nor did Officers

---

[7] Officer Gibson testified that, when he entered Plaintiff's jail cell on July 26, he observed Plaintiff "laying on the floor on a mat," had just been told by Plaintiff himself that "he didn't feel good," and was informed by

Gibson and Vance "immediately" perform these responsibilities after repeated and escalating requests for medical attention by Plaintiff's cellmate. Doc. 51, PageID 610. And on Thursday afternoon, despite Officers Gibson and Vance *themselves* noting that Plaintiff was "not eating and not acting right" and that he "would not get up and walk," (Doc. 60-1, PageID 950), they still refrained from immediately contacting medical staff—likely in violation of § 9.8.2(A)(1) of the Policy[8]—upon concluding based on their own personal assessment that "no medical or supervisory attention was required." Doc. 71, PageID 1090. This deliberate inaction— evidently informed by the shrewdness of Officers Gibson and Vance's "common sense"— occurred despite them having moved Plaintiff to an observation cell, where the Sixth Circuit has held that the mere physical act of moving a pretrial detainee to an observation cell tends to show that a condition is "sufficiently serious." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004). The culmination of all these factors informs this Court's determination that a reasonable jury could "conclude that [the inadequate training was] the result of [Middletown's] deliberate indifference to inmate health and safety." *Helphenstine*, 60 F.4th at 325.

Muterspaw contends that it was not "'patently obvious' that having correctional officers in the Middletown Jail notify the [J]ail nurse(s) of inmates who request to be seen or have reported complaints would lead to the violation of inmates' constitutional rights to medical care." Doc. 77, PageID 1162. But that argument misses the point. Plaintiff does not

---

Plaintiff's cellmate that Plaintiff had "had some bad drugs." Gibson Dep., Doc. 50, PageID 529–30, 36:10–37:14.

[8] "If a medical emergency occurs in the jail, jail staff will *immediately* call for an emergency squad, and the on-duty Shift Commander, or in his absence, the senior Sergeant and the jail nurse will be notified at once. If the staff member receiving the complaint is unsure as to the seriousness of the complaint, the ranking supervisor will be contacted as well as the jail nurse." Doc. 51, PageID 610 (emphasis added).

object to the unconstitutionality of a Jail policy of simply *contacting* medical personnel in the event of a medical emergency. Rather, Plaintiff takes issue with the *discretion* afforded to Middletown's correctional officers as the gatekeepers for inmates to obtain medical care. Plaintiff claims that non-medical Jail staff "were expected to exercise considerable independent judgment to determine whether any [medical] emergency existed, yet [were] provided no training to help officers exercise that judgment." Doc. 79, PageID 1173; *see also id.* at PageID 1175 ("Plaintiff contends that the [J]ail staff was provided virtually no guidance in how to exercise its discretion in assessing whether an inmate had a serious medical condition."). Hence, a reasonable jury could find that this considerable discretion afforded to Jail staff, who were not adequately trained to exercise that discretion, reflects Middletown's deliberate indifference to serious inmate health and safety concerns that could predictably arise at the Jail.

*Third*, the Court considers whether this inadequacy was closely related to or caused Plaintiff's injuries—his eventual sepsis and endocarditis diagnoses. The Court finds that a reasonable jury could conclude, at least at the summary judgment stage, that the causation element would be satisfied here. The parties' mutually opposing recitations of the facts demonstrate that a genuine issue of material fact exists as to this element. Therefore, summary judgment is not warranted.

> For example, Muterspaw claims that:
>
> The facts show that Middletown had an applicable policy and standard procedure for dealing with inmate medical complaints, that Gibson listened to the complaints about Plaintiff and informed Nurse Dumouchelle, and that, when faced with an obvious medical emergency, Gibson and Vance *immediately* consulted Nurse Dumouchelle, Nurse Wilmot, and Dr. Kaiser on the appropriate response.

Doc. 77, PageID 1160 (emphasis added). Meanwhile, Plaintiff claims that:

> Despite recognizing that Plaintiff's condition had deteriorated to the point that he needed to be transferred to an observation cell, the officers [Gibson and Vance] took no action to alert nurse Dumouchelle or any other medical staff member of this change in condition. All the officers did was transfer Plaintiff to an "observation cell" with no follow-up by way of recorded "observations", *nor any contact with medical personnel until Plaintiff was discovered unresponsive in his cell early the next day.*

Doc. 79, PageID 1176 (emphasis added). Here, the parties' diverging narratives are fundamentally irreconcilable. And either version, if this Court had the liberty to choose, would be dispositive to the outcome for a claim of deliberate indifference by Middletown. Unfortunately, for Defendants Dumouchelle and Muterspaw—or perhaps better stated, fortunately for Plaintiff—at the summary judgment stage, a court must view the evidence and draw all reasonable inferences in favor of the *nonmoving* party—in this case Plaintiff. *Matsushita*, 475 U.S. at 587.

Furthermore, the record demonstrates a plethora of inconsistencies in the parties' respective renditions of the factual predicates relating to causation—only a few of which are recounted below. On the one hand, Muterspaw argues that Aaron Smith's testimony "confirms that the standard procedure of a corrections officer notifying the nurse when an inmate makes a medical complaint was followed." Doc. 77, PageID 1161. Similarly, Officer Vance claimed that the "first time . . . [she] had heard anything from Smith stating that Plaintiff was sick or needed assistance" was the afternoon of Thursday, July 27. Vance Dep., Doc. 56, 45:16–18. But Aaron Smith's testimony also alleges that he made at least *four* requests to "various [correction officers]" for medical attention on behalf of Plaintiff—all of which appeared to have been ignored—and that he had heard Plaintiff make an unrequited verbal request "the first night" while at the Jail. Doc. 49, PageID 402. These are just a few of the litany of contradictions in the record that necessitate sending this claim to jury, as opposed

to granting a motion for summary judgment where the material facts are clearly still in dispute.

All in all, Plaintiff has demonstrated by sufficient proof that a reasonable jury could conclude that Middletown's training was inadequate for non-medical staff and corrections officers, that the inadequacy was caused by Middletown's deliberate indifference to inmate health and safety, and that the inadequacy caused Plaintiff's injuries. The Magistrate Judge therefore properly denied summary judgment in favor of Defendant Muterspaw and the city of Middletown as to this claim.

## III.    CONCLUSION

Accordingly, and for the reasons stated herein, Defendants Dumouchelle and Muterspaw's objections (Docs. 76, 77) are **OVERRULED**. The Magistrate Judge's Report and Recommendation (Doc. 71) is **ADOPTED** in its entirety.

**IT IS SO ORDERED.**

Dated:  March 28, 2025

Hon. Jeffery P. Hopkins
United States District Judge

27